**Edward B. FITZGERALD, Petitioner–Appellant,**

v.

**Charles E. THOMPSON, Warden, Respondent–Appellee.**

No. 90–4009.

United States Court of Appeals, Fourth Circuit.

Argued May 9, 1991.

Decided Aug. 26, 1991.

---

Bradley Specht Stetler, Office of Public Defender, Burlington, Vt., argued (Peter J. Murtha, Washington, D.C., on brief), for petitioner-appellant.

Robert H. Anderson, III, Asst. Atty. Gen., Office of the Atty. Gen., Richmond, Va., argued (Mary Sue Terry, Atty. Gen. of Virginia, Office of the Atty. Gen., on brief), for respondent-appellee.

Before RUSSELL and WILKINSON, Circuit Judges, and CHAPMAN, Senior Circuit Judge.

## OPINION

WILKINSON, Circuit Judge:

Appellant Edward B. Fitzgerald seeks habeas corpus relief under 28 U.S.C. § 2254 from his conviction and sentencing for capital murder, armed robbery, rape, abduction with intent to defile, and burglary. Finding no error in the district court's decision to dismiss Fitzgerald's petition, we affirm its judgment.

## I.

On the night of November 13, 1980, Fitzgerald and Daniel Johnson broke into a home where their acquaintance Patricia Cubbage was staying. Earlier that night, Fitzgerald had complained that Cubbage had "ripped him off." Once in the home, Fitzgerald slashed Cubbage with his machete and raped her. When Cubbage pleaded to be taken to a hospital, Fitzgerald denied her request by stating that he "had came there to do a job and he was going to finish it." Fitzgerald had Johnson help Cubbage get dressed. Fitzgerald took Cubbage's purse and the three of them left the house in Johnson's car.

Fitzgerald instructed Johnson to turn off a main road onto a dirt road. They forced Cubbage into some nearby woods. There Fitzgerald compelled Cubbage to perform oral sodomy on him. He then repeatedly stabbed Cubbage with the machete and a knife. Fitzgerald at one point inserted the machete into Cubbage's vagina and rectum. He then kicked Cubbage several times and left her in the woods where she bled to death from the approximately 184 stab wounds she had received.

Fitzgerald was eventually apprehended and tried in Chesterfield County, Virginia. The principal witnesses against him were his co-defendant Daniel Johnson, and Wilbur Caviness to whom Fitzgerald had confessed while the two were imprisoned in the Chesterfield County jail pending Fitzgerald's trial. Caviness testified at trial that Fitzgerald stated that he killed Cubbage because she had "snitched on him and snitched on a friend of his also." Fitzgerald presented a hybrid defense: attempting to shift the blame to his co-defendant and also attempting to show that he could not have formed the requisite intent because of the alcohol and drugs he had ingested during the evening of the killing. Fitzgerald was convicted of capital murder, armed robbery, rape, abduction with intent to defile, and burglary. The jury recommended that Fitzgerald be sentenced to death for

the capital offense and to life imprisonment for the other offenses. The court followed these recommendations.

Fitzgerald took a direct appeal to the Virginia Supreme Court which affirmed his convictions and sentences. *Fitzgerald v. Commonwealth*, 223 Va. 615, 292 S.E.2d 798 (1982). The United States Supreme Court denied Fitzgerald's petition for certiorari.

Fitzgerald next began state collateral proceedings which proved unsuccessful. *See Fitzgerald v. Bass*, 4 Va.App. 371, 358 S.E.2d 576 (1987); *Fitzgerald v. Bass*, 6 Va.App. 38, 366 S.E.2d 615 (1988) (en banc). At the end of those proceedings, the Virginia Supreme Court refused his petition for appeal. In response to a motion by the Commonwealth, the Virginia Supreme Court elaborated on its earlier ruling by stating that issues related to Caviness's testimony and to a challenged jury instruction on intent were procedurally barred. A petition for a writ of certiorari was denied by the United States Supreme Court.

Fitzgerald then began federal habeas proceedings. The district court dismissed his petition for a writ of habeas corpus and this appeal followed.

## II.

Fitzgerald advances various challenges to the validity of his conviction and sentencing. Three of these challenges pertain to the guilt phase of the trial and we shall address them in this section. The remaining two claims pertain to the penalty phase of the trial and they will be discussed in section III.

## A.

■ Fitzgerald contends that the Commonwealth's handling of the testimony of Wilbur Caviness violated his due process rights. He objects specifically to the Commonwealth's failure prior to trial to disclose relevant background information on Caviness such as his criminal history. Prior to trial, Fitzgerald's counsel sought from the Commonwealth any information affecting the credibility of the Common-

wealth's anticipated witnesses. The Commonwealth, in essence, responded that it would not turn over impeachment evidence because that was not a proper subject of discovery. Although this position was incorrect as a matter of law, Fitzgerald did not register any objection to the Commonwealth's position with the trial court nor did Fitzgerald challenge the Commonwealth's position on direct appeal. *Fitzgerald v. Bass*, 366 S.E.2d at 620–21. Fitzgerald raised the claim for the first time on collateral review at which time all three Virginia courts reviewing the claim rejected it as procedurally barred. Given the adequate and independent nature of the procedural default rule relied on by the state courts and the failure of Fitzgerald to demonstrate cause for the default, we are barred from addressing Fitzgerald's first claim relating to Caviness. *Coleman v. Thompson*, —— U.S. ——, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). Indeed, to do so would be to disregard the "concerns of comity and federalism" that underlie the independent and adequate state ground doctrine. *Id.* at ——, 111 S.Ct. at 2554.

■ Fitzgerald's second contention with regard to Caviness is that the Commonwealth failed to correct inaccurate testimony given by him at trial. Fitzgerald contends that some ambiguity exists over whether the Virginia Supreme Court intended for its default ruling to reach both aspects of the Caviness claim or whether the ruling was intended only as a determination on the claim relating to the nondisclosure of background information. Fitzgerald argues that the ambiguity is illustrated by the fact that the Virginia Court of Appeals addressed the inaccurate testimony claim on the merits and that the Commonwealth focused its procedural default arguments to the Virginia Supreme Court almost exclusively on the failure to disclose issue. He notes also that the federal district court did not consider the claim to be defaulted. We shall give Fitzgerald the benefit of the doubt on this point, see *Harris v. Reed*, 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989), and proceed to the merits of his claim.

Essentially, Fitzgerald contends that Caviness testified falsely in three ways. First, Caviness told the jury that he had only one felony conviction when in reality he had two or three prior felony convictions. Second, Caviness told the jury that no charges were pending against him though in fact two charges were pending against him in another county. Finally, Caviness denied that he had been offered anything for his testimony. Fitzgerald contends, however, that this was false because Caviness received payments for testifying at the trial and because Caviness had been a paid informant for law enforcement agencies in other cases.

We acknowledge that there were some factual errors in Caviness's testimony as it pertained to his past record. The state habeas courts concluded, however, that Caviness did not commit perjury. The errors in Caviness's testimony stemmed not from any intentional effort to deceive, but rather from mistaken beliefs about the legal classification of his prior convictions and the status of his pending charges. The Virginia Court of Appeals also agreed with the trial habeas court that the Commonwealth lacked actual knowledge of any inaccuracies in Caviness's testimony, though it charged the state with the not unreasonable burden of discovering the "criminal record of its witnesses." *Fitzgerald v. Bass*, 366 S.E.2d at 621–23. The Court of Appeals then canvassed the record for "any reasonable likelihood that the false testimony could have affected the judgment of the jury," see *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976), and it found none. 366 S.E.2d at 624–25.

We agree with this conclusion. For purposes of impeachment, the difference between one felony conviction and two or three convictions is not critical. In either case, the jury would be on notice that Caviness was a convicted felon. The jury was also aware that Caviness had been convicted of at least one misdemeanor involving moral turpitude. Although Caviness denied that charges were pending against him at the time of trial, he acknowledged

that charges were pending against him at the time he was incarcerated in the Chesterfield County jail with Fitzgerald. Indeed, it was due to his incarceration that he learned of the incriminating information. Caviness's testimony that he did not receive anything in return for his testimony is incorrect only in the sense that he was reimbursed for expenses incurred in coming to court to testify. As the state habeas court found, these reimbursements were "minor" and "customary." By the Commonwealth's accounting, these payments amounted to less than $100. Caviness did not receive any quid pro quo in return for his testimony nor was he planted in the jail in an attempt to elicit a confession from Fitzgerald. That Caviness may have worked as an informant in other jurisdictions in cases unrelated to Fitzgerald's does not undermine the accuracy of his denial of receiving benefits in return for his testimony.

In essence, the correction of those inaccuracies that were in Caviness's testimony would merely have provided cumulative impeachment evidence. Defense counsel had every opportunity to bring Caviness's credibility into question. In fact, Fitzgerald's counsel focused the jury's attention on Caviness's credibility in closing argument when he stated that Caviness was a "convicted felon, a person involved in crimes of moral turpitude and a multiple offender—a jailbird and a drone."

Two other considerations bear on the materiality of Caviness's testimony. The first is that Caviness was not the central prosecution witness; rather Fitzgerald's co-defendant Daniel Johnson was the chief witness. Caviness's testimony essentially corroborated that of Johnson. In addition, the credibility of Caviness's testimony was bolstered by the fact that it revealed aspects of the crime that had not been public knowledge. "There was a strong inference, therefore, that Caviness' testimony regarding these events came from his conversation with Fitzgerald." *Fitzgerald v. Bass*, 366 S.E.2d at 625. In these circumstances, it seems clear that what inaccuracies there were in Caviness's testimony did not affect the jury verdict.

### B.

Fitzgerald next contends that he received ineffective assistance of counsel because his trial attorneys failed to object to this jury instruction: "Each person is presumed to intend the natural and probable consequences of his acts." According to Fitzgerald, his attorneys should have objected to this instruction because it violated the principles of *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), by creating a conclusive or a burden shifting presumption on intent.

■ Fitzgerald raised the *Sandstrom* issue for the first time on state habeas. The Virginia Supreme Court ruled Fitzgerald to be in procedural default on this claim. Fitzgerald unquestionably has defaulted on a challenge to the underlying validity of the jury instruction by his attorneys' failure to object to it at trial. *See Coleman v. Thompson,* —— U.S. ——, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

■ Fitzgerald argues, however, that no adequate state ground exists for barring his ineffective assistance claim because he substantially complied with state procedural rules and invoked the substance of that claim in each state collateral proceeding. Fitzgerald notes that his petition to the Virginia Supreme Court focused on the prejudice associated with the challenged instruction and that prejudice was at the heart of his ineffective assistance claim because the trial habeas court had already ruled his attorneys' performance deficient. While we think the presentation of his claim no model of clarity, the record also leaves us with some question about why or how the procedural default was found. We shall thus address the ineffective assistance claim on the merits so as to leave no doubt that the state judgment of conviction was constitutionally sound.

To prevail on his ineffective assistance claim, Fitzgerald must demonstrate that actual prejudice flowed from his attorney's failure to object to the instruction. *See, e.g., Nix v. Whiteside,* 475 U.S. 157, 175, 106 S.Ct. 988, 998, 89 L.Ed.2d 123 (1986). Fitzgerald's burden on this point is a heavy one. He must show a "reasonable proba-bility" that but for his attorney's failure to object to the instruction "the result of the proceeding would have been different." *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984). Fitzgerald insists that the mandatory presumption created by the jury instruction "deprived [him] of his substantial defense that drugs and alcohol vitiated his intent to premeditate." The Commonwealth responds that Fitzgerald was not prejudiced by the jury instruction because there was overwhelming evidence that he was capable of forming the requisite intent.

We agree with the Commonwealth. The actions taken by Fitzgerald belie any claim that his ability to form the requisite intent was impaired. Evidence of intent and Fitzgerald's ability to form it can be gleaned from comments he made about his victim prior to the murder. For example, Fitzgerald complained that Cubbage had "ripped him off." Fitzgerald also stated to Cubbage that "he had came there to do a job and he was going to finish it." Further evidence that Fitzgerald was not impaired by drugs and alcohol can be demonstrated by actions that required thought and physical dexterity. For instance, he had the presence of mind to reduce the chance that he would be apprehended for his offense: he directed Johnson to drive to an isolated area where he would complete his crimes, he and Johnson covered Cubbage's body with leaves, and he later laundered his blood stained clothes and those of his co-defendant. While stabbing Cubbage, Fitzgerald carved linear slashes resembling tic-tac-toe designs on her body and after the crimes were completed, Fitzgerald put an intricate tatoo on Johnson's arm. Based on this evidence we do not believe that Fitzgerald was prejudiced by his lawyers' failure to object to the jury instruction. There is no doubt that he possessed the ability to form the intent necessary for capital murder and there is no doubt that he intended to do precisely what he did. *See Waye v. Townley,* 871 F.2d 18 (4th Cir.1989).

■ In the face of this considerable body of evidence, Fitzgerald attempts to draw

our attention to cases that have applied harmless error analysis to *Sandstrom* claims and concluded that the instruction was not harmless. These cases are inapposite. If Fitzgerald had raised his challenge to the instruction in a timely manner, then his substantive claim would be assessed on habeas corpus under a harmless error standard. *See Rose v. Clark,* 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986). However, allowing Fitzgerald to rely upon cases using harmless error analysis would effectively treat Fitzgerald as if he had not defaulted on his substantive challenge to the jury instruction. Attempts by petitioners to transform claims whose underlying merits have been defaulted into questions of ineffective assistance of counsel require analysis under the more stringent *Strickland* standard. Even if harmless error analysis were applicable here, we note that courts have concluded that an instruction violative of *Sandstrom* was harmless beyond a reasonable doubt when considered in the context of the whole case. *Burger v. Kemp,* 483 U.S. 776, 782 n. 5, 107 S.Ct. 3114, 3119 n. 5, 97 L.Ed.2d 638 (1987); *Tweety v. Mitchell,* 682 F.2d 461, 465 (4th Cir.1982).

Viewing the instruction on intent in the context of the entire case, however, serves to confirm the fact that Fitzgerald suffered neither harm nor prejudice from his attorneys' failure to object. It is important, for example, to consider the challenged instruction in light of other jury instructions. *See Boyde v. California,* 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990). Instruction no. 26 prohibited a conviction for capital murder or for murder in the first degree if the jury found Fitzgerald "so greatly intoxicated by the voluntary use of alcohol and/or drugs that he was incapable of deliberating or premeditating...." This specific instruction on Fitzgerald's intoxication defense makes it unlikely that the jury would have convicted him of capital murder if it had believed he was intoxicated. The jury instructions also stated that "intent is a purpose formed in a person's mind which may be shown by the circumstances surrounding the offense." The jury charge also contained additional references to the defendant's presumption of innocence and the Commonwealth's burden to prove beyond a reasonable doubt the elements of each offense. Given the fairness of the instructions when viewed in their entirety and given the overwhelming evidence that Fitzgerald acted with the requisite intent, we hold that Fitzgerald has failed to show that he was prejudiced by the commission of attorney error.

### C.

■ Fitzgerald raises two other claims of ineffective assistance of counsel related to jury instructions. First, Fitzgerald's counsel did not seek an instruction that every reasonable doubt as to the grade of an offense shall be resolved in favor of the defendant. Second, Fitzgerald argues that his counsel erred when he failed to seek an instruction that charged that every unlawful homicide is presumed to be murder in the second degree. Fitzgerald contends that no tactical explanation for these decisions exists and that he was prejudiced by them because his defense was so grounded on his inability to premeditate.

We believe, on the contrary, that Fitzgerald's trial counsel made reasonable tactical decisions that should not now be second-guessed on collateral review. *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. As trial counsel testified at the state habeas hearing, the omitted instructions were primarily cumulative of other instructions that were given to the jury. These other instructions properly informed the jury of the range of possible verdicts from capital murder to acquittal and admonished it as to the Commonwealth's burden of proof. Thus, this is not a case of the jury being misinformed by the absence of the challenged instructions. The decision not to seek these additional instructions was also reasonable given the theory of the case advanced by Fitzgerald at trial. One of his defenses was that Johnson had murdered Cubbage and was now attempting to frame Fitzgerald. Fitzgerald's counsel testified that he did not seek the instruction relating to the presumption of second degree murder because he felt it would detract from the frame-up

defense by increasing the chances that Fitzgerald would be convicted of some crime. In these circumstances, Fitzgerald has satisfied neither the performance nor the prejudice prong of *Strickland.*

## III.

Fitzgerald finally challenges two aspects of the penalty phase of the trial. He first contends that his counsel was ineffective at sentencing for failing to present available mitigating evidence. Fitzgerald also argues that the trial court impermissibly directed the jury to return a finding of aggravating circumstances. We shall briefly address each claim.

### A.

■ Fitzgerald argues that his counsel should have called his probation officer to testify on his behalf. According to Fitzgerald, his probation officer would have informed the jury of Fitzgerald's fine progress while on probation. Instead, the jury learned only that Fitzgerald was on probation for the shooting of his wife. Fitzgerald also contends that his counsel should have secured psychological testimony similar to that offered in his behalf at the state habeas hearing. At the hearing, Dr. Brad Fisher testified that life imprisonment, rather than the death sentence, would make penological sense in Fitzgerald's case.

Petitioner's attempts to charge counsel with the adverse outcome in his case ignore the difficulties under which his lawyers labored. *Cf. Burger v. Kemp,* 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987). The state habeas court found that Fitzgerald's counsel investigated possible sources of mitigating evidence. Mitigation evidence was presented, for example, from Fitzgerald's brother, mother, and co-worker. In some cases, however, witnesses chose not to testify for Fitzgerald. Despite his counsel's recommendation, Fitzgerald himself chose not to testify at the penalty phase. This was particularly damaging because trial counsel believed that where such heinous crimes were involved, Fitzgerald's only real chance to avoid the death penalty would be by his own plea for mercy.

With respect to other evidence that Fitzgerald claims should have been presented, trial counsel had interviewed three psychiatrists prior to trial and had determined that Dr. Lordi would give the best testimony. Because his testimony was not especially effective during the guilt stage, however, counsel decided to introduce his report at the penalty stage rather than have him testify. The state habeas court found that the probation officer's testimony would not have been especially helpful given that the probation officer supervised sixty other individuals and had seen Fitzgerald less frequently in the months preceding the murder. Even if the probation officer and Dr. Fisher had been called to testify, their testimony at most might have diminished the impression that Fitzgerald would be dangerous in the future. It was for the vileness of his crime that Fitzgerald received a capital sentence, however. Virginia Code Ann. § 19.2–264.4(c) defines vileness as "torture, depravity of mind or aggravated battery to the victim." It seems farfetched to lay at counsel's doorstep the failure to convince the jury that Fitzgerald's conduct was not at the core of the statute's contemplation.

### B.

■ Fitzgerald's last challenge pertains to the rendering of the jury's verdict. Under Virginia law, a jury can impose a death sentence based either on the vileness of a crime or the future dangerousness of a defendant or on both factors. Va.Code Ann. § 19.2–264.2 (1990). The trial court in this case initially refused to accept the jury's verdict form because it was unclear whether the jury had found both aggravating circumstances to be present or only one. The confusion was created because the jury had not struck out the "and/or" provision pertaining to the aggravating circumstances on the jury form. The judge asked the foreman whether the jury intended to select "and", but the foreman responded that "or" was the jury's choice. The judge explained that the jury would

then have to select which of the two factors it found. After the jury redeliberated, it again chose "or" without indicating a factor. The judge reinstructed the jury which after again deliberating chose vileness.

Fitzgerald contends that the judge's statement to the jury that it must elect between the aggravating circumstances ruled out the possibility that the jury would select life imprisonment if it could not reach a unanimous decision on which aggravating factor was present. In effect, says Fitzgerald, the judge directed a verdict.

We find that Fitzgerald has defaulted on this claim because the state habeas trial court dismissed the claim as procedurally defaulted and it was not argued to the Virginia Supreme Court. Even if the claim were not defaulted, it would have little merit because the jury obviously chose death as the penalty and it simply needed some guidance on expressing which factor it found to justify the penalty. A poll of the jurors indicated their unanimity on the vileness factor.

## IV.

Both the trial and the subsequent review of that trial in the state system were in accordance with law. We see no reason to disturb the verdict. For the foregoing reasons, the judgment of the district court dismissing Fitzgerald's petition for habeas corpus is

AFFIRMED.