Present:   All the Justices

PAUL WARNER POWELL
                    OPINION BY CHIEF JUSTICE LEROY R. HASSELL, SR.
v.  Record No. 042716              September 15, 2006

WARDEN OF THE SUSSEX I
STATE PRISON

UPON A PETITION FOR A WRIT OF HABEAS CORPUS
UPON A REHEARING

I.

In this habeas corpus proceeding, we consider whether petitioner, who was convicted of capital murder for the killing of Stacey Lynn Reed during the commission of or subsequent to an attempted rape in violation of Code § 18.2-31(5), suffered prejudice within the meaning of Strickland v. Washington, 466 U.S. 668 (1984) because his trial counsel failed to object to the admission in evidence of a form that contained an inaccuracy regarding petitioner's criminal history.

II.

In September 2000, Paul Warner Powell was sentenced to death for the capital murder of Stacey Lynn Reed.  On direct appeal, this Court reversed the conviction and remanded the case to the circuit court for a new trial on a charge no greater than first-degree murder for the killing of Stacey Reed, if the Commonwealth be so advised.  Powell v. Commonwealth, 261 Va. 512, 552 S.E.2d 344 (2001).

After the proceeding was remanded, Powell wrote a letter to the Commonwealth's Attorney who had prosecuted Powell during the first trial.  Powell described, in detail, the murder and attempted rape of Stacey Reed, and he provided facts that were previously unknown to the Commonwealth.  The Commonwealth then nolle prossed the indictment in the remanded case.  A grand jury for Prince William County subsequently indicted Powell for the capital murder of Stacey Reed during the commission of or subsequent to an attempted rape.  Powell was tried by a jury that convicted him of capital murder and fixed his punishment at death.  The circuit court entered a judgment confirming the jury's verdict and we affirmed that judgment.  Powell v. Commonwealth, 267 Va. 107, 590 S.E.2d 537 (2004).

Subsequently, Powell filed a petition for habeas corpus in this Court alleging numerous claims, including ineffective assistance of counsel.  During the sentencing hearing, the Commonwealth introduced in evidence, without objection, Exhibit 51 that is attached to this opinion.  Exhibit 51, captioned Powell's "Virginia Criminal Record," consists of five pages and was generated by the Federal Bureau of Investigation, National Crime Information Center.  Powell asserts, among other things, that trial counsel were ineffective, and he was prejudiced by their failure to object

to this document and the inaccuracy contained therein.  We entered an order rejecting all Powell's habeas corpus claims. <u>Powell v. Warden of the Sussex I State Prison</u>, Record No. 042716 (Nov. 8, 2005).

Powell filed a petition for rehearing and requested that this Court reconsider its order dismissing his habeas claims, including his claim that he was denied effective assistance of counsel because of counsel's failure to object to an erroneous entry on page three of Exhibit 51.  This Court granted Powell a rehearing limited to that one claim, and we placed this matter on our argument docket.

### III.

The following facts were presented to the jury that found Powell guilty of capital murder and fixed his punishment at death.  In January 1999, Robert Culver and his fiancée, Lorraine Reed, lived together in Manassas, Virginia, with Reed's two daughters, Stacey Lynn Reed and Kristie Erin Reed. On January 28, 1999, Powell went to the Reeds' home.  Stacey, then 16 years old, left home to go to work, and Powell remained there alone with Kristie, who was 14.

That afternoon, Kristie called her mother by telephone and informed her that Powell refused to leave the home. Kristie's mother told Kristie to order Powell to leave.

3

Kristie was concerned because Powell "kept walking back and forth down the hallway looking in the rooms."

On the afternoon of January 29, 1999, Kristie arrived home from school and was startled to find Powell in her house. She asked Powell "where Stacey was." He replied, "she was in her room." Kristie walked to Stacey's room, but Stacey was not there. Then, Kristie turned to enter her own room and saw Stacey's body lying on the floor.

Powell, who had followed Kristie to the bedroom, ordered Kristie to go downstairs to the basement. Kristie knew that Powell customarily armed himself with a knife. She had previously observed Powell with a butterfly knife and "another long knife that was in a brown pouch type thing."

Powell forced Kristie to accompany him to the basement, where he ordered her to remove her clothes. She took her clothes off because she "didn't want to die." Powell told Kristie to lay on the floor, and then he raped her.

After Powell raped Kristie, he dressed himself, and he used shoelaces taken from Kristie's shoes to tie her feet together. He also used shoelaces to tie her arms behind her back. Someone knocked on the door to the house, and Powell went upstairs, leaving Kristie naked and bound on the basement floor.

While Powell was upstairs, Kristie was able to free her hands, and she tried to "scoot" across the floor and hide beneath the basement steps. Powell returned to the basement, removed Kristie's eyeglasses, and strangled her until she was unconscious. Powell stabbed Kristie in the stomach, and the knife stopped within a centimeter of her aorta. He slashed her in her neck numerous times, and the repair of the knife wounds required 61 sutures. She had multiple stab wounds to her neck and abdomen. She also had wounds on her wrists.

Robert Culver arrived at the home at 4:15 p.m. on January 29, 1999. He could not locate Kristie or Stacey. He went to the girls' bedrooms and saw that Stacey's room was in disarray. He entered Kristie's room, turned on the lights, and found Stacey's body on the floor. He observed blood on her body and saw that she was not breathing.

When Culver went to the basement in search of a telephone, he discovered Kristie lying naked and bound on the floor, bleeding from her neck and stomach. He saw that she had been stabbed in the stomach and her "throat was slit pretty severely, many times." Culver found a telephone, dialed 911, and spoke to emergency response personnel. Although Kristie was experiencing life-threatening injuries, she was able to tell police officers and paramedics that Paul Powell was her assailant.

Stacey's death was caused by a stab wound to her chest. The wound pattern indicated that the blade of the knife pierced her heart and was twisted upon withdrawal. The blade of Powell's knife was consistent with the stab wounds.

There were numerous bruises on Stacey's head, neck, chest, abdomen, back, arms, and legs. She suffered stab wounds in her back and arm. She also had abrasions on her left hand and wrist that were characterized as defensive wounds. Stacey's body contained bruises on her lower neck that were consistent with someone stepping or stomping on her face and neck.

Police officers arrested Powell on January 30, 1999 at the home of a friend. The police officers also located a blue sports bag that belonged to Powell. A nine-millimeter semiautomatic pistol with a full magazine containing 10 Winchester nine-millimeter cartridges was in the bag. The bag also contained a survival knife with a five and one-half inch blade inside a black sheath and a butterfly knife with a five-inch blade. The survival knife sheath contained a dark reddish-brown stain. The DNA profile obtained from the stain on the sheath was consistent with the DNA profile of Stacey Reed and different from the DNA profile of Kristie Reed and Paul Powell. The probability of selecting an unrelated individual with a matching DNA profile at the Powerplex loci

6

as contained on the sheath is approximately one in 1.1 billion in the Caucasian population.

After his arrest, Powell consented to several interviews with police officers. During one interview, he stated that he had been at the Reeds' home on January 29, 1999 and that Stacey was dead because "she was stupid." Powell told the police officers that he and Stacey had an argument because she had a black boyfriend, and Powell "didn't agree with interracial dating." Powell claimed that during the argument, Stacey attacked him and scratched his face, and then he pushed her to the floor. He claimed that Stacey attacked him again, and that she "got stuck" on his knife. Powell also initially denied raping Kristie.

In a second statement to police officers, Powell admitted that he raped Kristie. The detective who interviewed Powell testified that Powell stated that he had to kill Kristie because "she was the only witness and he would have to go to jail."

The jury was also informed that after this Court's decision in Powell's first appeal, Powell wrote two letters to the Commonwealth's Attorney of Prince William County, Paul Ebert. Below is the content of a letter that Powell wrote, dated October 21, 2001.

"Mr. Ebert,

7

"Since I have already been indicted on first degree murder and the Va. Supreme Court said that I can't be charged with capital murder again, I figured I would tell you the rest of what happened on Jan. 29, 1999, to show you how stupid all of y'all mother fuckers are.

"Y'all should have known that there is more to the story than what I told by what I said. You had it in writing that I planned to kill the whole family. Since I planned to kill the whole family, why would I have fought with Stacie before killing her? She had no idea I was planning to kill everybody and talked and carried on like usual, so I could've stabbed her up at any time because she was unsuspecting.

"I had other plans for her before she died. You know I came back to the house after Bobby's lunch break was over and he had went back to work. When I got back, she was on the phone so I went inside and I laid down on the couch. When the cab came to bring me my pager, I ran out of the house and she jumped and got off the phone and came off the porch to see why I ran out of the house like I did.

"When the cab left we went in the house. I laid on the couch again and she went to her room and got her clothes and went downstairs to do her laundry. When she went downstairs, I got up and shut and locked the back door and went downstairs. We talked while she put her clothes in the wash. We continued talking when she had everything in the wash and I reached over and touched her tit and asked if she wanted to fuck. She said no, because she had a boyfriend.

"I started arguing with her because she had never turned anybody down because of having a boyfriend.

"We started walking upstairs, arguing the whole time. When we got upstairs we went to her room and she turned the radio off. After she turned the radio off I pushed her onto her bed and grabbed her wrists and pinned her hands down by her head and sat on top of her. I told her that all I wanted to do

8

was fuck her and then I would leave and that we could do it the easy way or the hard way.

"She said she would fuck me so I got up.  After I got up, she got up and started fighting with me and clawed me face.  We wrestled around a little and then I slammed her to the floor.  When she hit the floor I sat on top of her and pinned her hands down again.  She said she would fuck me and I told her that if she tried fighting with me again, I would kill her.

"When I got up she stood up and kept asking me why I was doing this and all I kept saying is take your clothes off.  Finally she undid her pants and pulled them down to her ankles.  She was getting ready to take them the rest of the way off and the phone rang.  When she heard the phone she pulled her pants back up and said she had to answer the phone.  I pushed her back and said no.  She said that she wouldn't say anything about me being there and I told her no and to take her clothes off.

"She tried to get out of the room again and I pushed her back and pulled out my knife.  I guess she thought I was just trying to scare her and that I wouldn't really stab her because she tried to leave again.

"When she got to me and tried to squeeze between me and the door jam I stabbed her.  When I stabbed her, she fell back against the door jam and just looked at me with a shocked look on her face.

"When I pulled the knife out she stumbled a couple steps and fell in her sister's room.  I walked over and looked at her.  I saw that she was still breathing so I stepped over her body and into the bedroom.  Then I put my foot on her throat and stepped up so she couldn't breath.  Then I stepped down and started stomping on her throat.  Then I stepped back onto her throat and moved up and down putting more pressure to make it harder to breathe.

"When I didn't see her breathing anymore, I left the room and got some iced tea and sat on the couch and

smoked a cigarette.  You know the rest of what
happened after that point.

"I would like to thank you for saving my life.  I
know you're probably wondering how you saved my
life, so I'll tell you.

"You saved my life by fucking up.  There were 2 main
fuck-ups you made that saved me.  The first was the
way you worded my capital murder indictment.  The
second was the comment you made in your closing
argument when you said we won't know because he
won't tell us.

"One more time, thank you!  Now y'all know
everything that happened in that house at 8023
McLean St. on Jan. 29, 1999.

"I guess I forgot to mention these events when I was
being questioned.  Ha Ha! Sike!

"I knew what y'all would be able to prove in court,
so I told you what you already knew.  Stacey was
dead and no one else was in the house so I knew
ya'll would never know everything she went through
unless she came back to life.

"Since the Supreme Court said I can't be charged
with capital murder again, I can tell you what I
just told you because I no longer have to worry
about the death penalty.  And y'all are supposed to
be so goddamn smart.  I can't believe that y'all
thought I told you everything.

"Well, it's too late now.  Nothing you can do about
it now so fuck you you fat, cocksucking, cum
guzzling, gutter slut.  I guess I'll see your bitch
ass on Dec. 18 at trial because I'm not pleading to
shit.  Tell the family to be ready to testify and
relive it all again because if I have to suffer for
the next 50 or 60 years or however long then they
can suffer the torment of reliving what happened for
a couple of days.

"I'm gone.  Fuck you and anyone like you or that
associates with people like you.  I almost forgot,

fuck your god, too.  Jesus knows how to suck a dick
real good.  Did you teach him?

"Well, die a slow, painful, miserable death.  See ya
punk.

"Do you just hate yourself for being so stupid and
for fuckin' up and saving me?

"Sincerely,

"Paul Powell."

In a statement to a police officer on November 2, 2001,

Powell gave the following description of Stacey's murder:

"She walked over to and uh I pushed her back.  And
then she walked over to me again I think and then I
pulled my knife out and you know, and she looked at
me you know.  I guess she thought I wouldn't stab
her or whatever.  So she tried to leave and go to
answer the phone.  That's that.

. . . .

"[After she got stabbed,] [s]he just looked at me
for a minute you know and then you know, she . . .
she was surprised and them um, I pulled the knife
out, you know she stumbled a few steps, fell down in
Christy's doorway.  I just walked over and looked at
her.  And I stepped over top of her and stepped on
her throat and then stood on her throat and then
stomped on her throat . . . then I stood on her
throat until I didn't see her breathing no more.

. . . .

"What I'm saying I was stepping on her.  I'm saying
I put all my weight on her.  I'm saying that I put
my foot there you know and then I lifted myself up
to where I was standing on top of her.  Started
stomping on her throat.  And then man, I just stood
on her throat again until I didn't see her breathe
no more."

11

Before he raped Kristie, Powell knew that he intended to kill her. In response to a police officer's question: "Before you raped [Kristie], you knew you were going to kill her; didn't you?", Powell responded: "I really didn't have a choice; did I?"

While incarcerated in jail awaiting his capital murder trial, Powell sent a letter to Lorraine Reed, the mother of Stacey and Kristie. Powell enclosed a photograph of a partially nude woman. Powell wrote:

"Lorraine,

"I was wondering if you might be able to help me think of something. I found this picture in a magazine and it kinda looks like someone I know or used to know, but I can't think of the persons name. I think you know the person too, so I was wondering if you could tell me the name of the person this picture resembles so I can quit racking my brain trying to think of it? I would appreciate it. If you don't know the person I'm talking about, ask Kristie or Kelly Welch because I know they know who I'm thinking of. If you talk to the person I'm talking about, please give her my address and tell her to write me."

The partially nude woman shown in the photograph resembled Lorraine Reed's daughter, Stacey.

Powell wrote a letter to a friend while he was incarcerated. He stated:

"About when you asked me why I wouldn't do to you what I did to Stacie, I couldn't ever hurt you because you mean to much to me. See Stacie didn't mean anything to me. She was a nigger lover and some of her wannabe skin head friends were supposed

to kill me.  That's part of the reason why she died.
Almost everything that happened in that house was
planned.  The only thing that wasn't planned was
trying to fuck Kristie.  What was supposed to happen
was, Stacie was supposed to die, and did, Kristie
was supposed to die and then I was going to wait for
their mom and stepdad to get home and I was going to
kill them and then I was going to take their moms
truck and then I was gonna go to North Carolina and
knock this dude off that stole all of my clothes and
everything else I owned.  I had been thinking about
doing it for along time but I could never bring
myself to do it.  I don't know what happened to make
me finally do it.  I feel bad for doing it.  Stacie
was a good kid."

Powell wrote, in another letter:

"Hey babe, what's happening?  Not too much
here.  I writing you to see if you could get one of
your guy friends to do me a favor.  You know that
Kristie is telling the cops things and that she is
going to testify against me in court.  I was
wondering if you could get somebody to go to a pay
phone and call Kristie and tell her she better tell
the cops that she lied to them and tell her she
better not testify against me or she's gonna die."

Powell sent the following letter to the Commonwealth's

Attorney of Prince William County:

"Fat Ebert,

"What's up you fat head fucker?  I'm just
writing to tell you, since you want to kill me so
Goddamn bad for killing your nigger loving whore,
set up a court date closer than Oct. 25 so I can go
ahead and get this bullshit over with and plead
guilty so you can kill me and get it over with,
unless you want to let me out so I can kill the rest
of the nigger lovers and all the niggers, Jews,
Spics and everybody else in this fucked up country
that's not white.  That includes you because you are
a nigger loving Jewish fucking faggot.  I will see
you in hell bitch.

13

"your buddy,

"Paul Powell

"P.S.  Watch your back!"

The jury viewed writings and drawings taken from Powell's jail cell that demonstrated his hatred of people who were not Caucasian.  Additionally, the jury heard evidence that Powell told police officers that he was a racist and described his violent racial views.  He stated, "[e]verybody that ain't white shouldn't – he needs to die."  Powell had told a police officer that he wanted to purchase a gun to "[k]ill somebody. Kill a lot of somebodies . . . [j]ust for something to do." The jury was aware of Powell's criminal record, including three convictions for contributing to the delinquency of a minor, two larceny convictions, and three felony convictions for abduction, rape, and attempted capital murder of Kristie.

IV.

Powell argues that his trial counsel were ineffective and that he was prejudiced because they failed to object to the admission of the NCIC form that contained an incorrect entry that Powell had a prior conviction for capital murder.

The United States Supreme Court, in Strickland v. Washington, 466 U.S. 668 (1984), articulated the relevant principles that we must apply in the resolution of Powell's claim.  In Strickland, the Supreme Court stated:

14

"A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.  First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable."

Id. at 687.  Accord Wiggins v. Smith, 539 U.S. 510, 534 (2003); Lockhart v. Fretwell, 506 U.S. 364, 369-70 (1993); Lenz v. Washington, 444 F.3d 295, 302-03 (4th Cir. 2006); Hedrick v. True, 443 F.3d 342, 349 (4th Cir. 2006); Vinson v. True, 436 F.3d 412, 418 (4th Cir. 2005).

Explaining the two-part test enunciated in Strickland, the Supreme Court noted:

"An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.  Cf. United States v. Morrison, 449 U.S. 361, 364-365 (1981).  The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding.  Accordingly, any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution."

Strickland, 466 U.S. at 691-92.

15

As the Supreme Court has instructed, Powell is required to establish that trial counsel's alleged error, in this instance, the failure to object to the admission of evidence, resulted in prejudice to him. The Supreme Court stated in Strickland:

> "[A]ctual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice. . . . Even if a defendant shows that particular errors of counsel were unreasonable, therefore, the defendant must show that they actually had an adverse effect on the defense."

Id. at 693.

The Supreme Court has also held that "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Id. at 697.

The United States Supreme Court has identified three "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." United States v. Cronic, 466 U.S. 648, 658 (1984); Bell v. Cone, 535 U.S. 685, 695-96 (2002) ("[In Cronic,] we identified three situations implicating the right to counsel that involved circumstances 'so likely to prejudice

16

the accused that the cost of litigating their effect in a particular case is unjustified.' [Cronic, 466 U.S. at 658]"). The United States Supreme Court held that a defect is presumptively prejudicial if (1) there has been a "complete denial of counsel" at "a critical stage" of the proceedings, Cronic, 466 U.S. at 659, 662; or (2) "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing," id. at 659; or (3) counsel is called upon to render assistance under circumstances where competent counsel very likely could not, id. at 659-62.  Bell, 535 U.S. at 695-96. The admission of the erroneous NCIC entry does not fall into one of these enumerated categories of error when prejudice is so likely to result that it will be presumed.  Accordingly, this Court must apply the Strickland test to determine whether the error was prejudicial.

The Supreme Court's decision in Strickland applies to cases in which a habeas petitioner has been sentenced to death and in Strickland, the Supreme Court discussed the standard that this Court must apply to determine whether Powell suffered prejudice:

> "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.

17

. . . .

"When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer – including an appellate court, to the extent it independently reweighs the evidence – would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

"In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors."

Id. at 694-96.

The Supreme Court stated in Kimmelman v. Morrison, 477 U.S. 365, 382 (1986): "As is obvious, Strickland's standard, although by no means insurmountable, is highly demanding." Accord Fitzgerald v. Thompson, 943 F.2d 463, 468 (4th Cir. 1991).

As the Supreme Court directed in Strickland, we need not consider whether Powell's trial counsel's performance was

18

deficient because we proceed directly to the issue whether Powell suffered prejudice "as a result of the alleged deficiencies."  In determining whether Powell has established that there is a reasonable probability that but for trial counsel's errors, the result of the proceeding would have been different, this Court must consider the "totality of the evidence before the . . . jury."  Strickland, 466 U.S. at 695.

Powell complains about trial counsel's failure to object to an entry on the bottom of page three of the NCIC form.  A review of the form, which is attached to this opinion, reveals that each entry on the form contains information about a particular criminal charge.  Each entry contains the name and date of the offense charged with the statutory reference, an arrest date, the jurisdiction where the offense was charged, the resulting conviction if any, a date of disposition, and various codes.

Powell contends that he was prejudiced by trial counsel's failure to object to the entry on the bottom of page three of the form that incorrectly stated that Powell was convicted of capital murder.  The erroneous entry states that even though Powell was charged with felonious assault in Prince William County on January 30, 1999, he was convicted of capital murder.  This entry, which refers to Powell's attack on Kristie Reed, erroneously contains the phrase "capital murder"

when it should have contained the phrase "attempted capital murder."

When introducing the NCIC report, the Commonwealth's Attorney accurately recited Powell's criminal record:

> "Your honor, as an initial matter, the Commonwealth would move for the introduction of the Certified Copy of the Defendant's prior criminal record consisting of two convictions in 1997 for contributing to the delinquency of a minor.  One conviction in 1999 for that same crime.  A petty larceny in 1998 and a grand larceny in 2001 along with the three felony convictions that is; rape, abduction with intent to defile and attempted capital murder involving Kristie."

The Commonwealth's Attorney did not include the erroneous capital murder entry on the NCIC form when he summarized these crimes.  Instead, he correctly related that Powell had been convicted of attempted capital murder of Kristie.

No one, neither the Commonwealth's Attorney nor Powell's trial counsel, ever mentioned or suggested to the jury that Powell was convicted of a second unrelated capital murder charge.  In fact, various statements made by Powell's trial counsel and the Commonwealth's Attorney informed the jury that Powell had never been convicted of an unrelated capital murder charge.  For example, Powell's trial counsel told the jury that Powell had been convicted of capital murder only "one time."  None of the attorneys referenced the incorrect capital

murder conviction on the NCIC report in their arguments to the jury.

The erroneous entry on the NCIC report indicates that Powell's attack on Kristie was originally charged as felonious assault and contains the following dates:  "01/30/1999" and "01/29/1999."  The jury that sentenced Powell to death knew, however, that "01/30/1999" was the date of Powell's arrest and "01/29/1999" was the date Powell committed the crimes against Stacey and Kristie Reed.  The erroneous entry refers to "Prince William Co." and the jury knew that Prince William County was the location of Powell's crimes against Stacey and Kristie.  Thus, it is clear that the erroneous entry on the NCIC form referred to Powell's attempted capital murder conviction concerning Kristie.

Upon our review of the totality of the evidence that the jury considered, "[t]aking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings," Strickland, 466 U.S. at 696, we conclude that Powell has failed to demonstrate a reasonable probability that the result of the capital murder trial would have been different and hence he has not suffered prejudice as required

21

by the highly demanding standard that the Supreme Court established in Strickland.[*]

Code § 19.2-264.2 prescribes the conditions that must be satisfied before a jury can impose the sentence of death in Virginia:

> "In assessing the penalty of any person convicted of an offense for which the death penalty may be imposed, a sentence of death shall not be imposed unless the court or jury shall (1) after consideration of the past criminal record of convictions of the defendant, find that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing serious threat to society or that his conduct in committing the offense for which he stands charged was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim; and (2) recommend that the penalty of death be imposed."

The jury that imposed the sentence of death upon Powell concluded:

> "We, the jury, on the issue joined, having found the defendant, PAUL WARNER POWEL [sic], guilty of capital murder in that he did willfully, deliberately, and premeditatively kill and murder

---

[*] Contrary to the Supreme Court's instructions in Strickland, the dissent focuses solely upon the improperly admitted evidence and does not consider the totality of the evidence before the jury. The dissent argues that we have usurped the jury's "very broad discretion" and engaged in "speculation" by considering the weight of the Commonwealth's evidence against Powell. However, in order to perform the review mandated by Strickland, we must weigh the evidence to determine whether there is a reasonable probability that the error affected the outcome of the proceedings. Wiggins, 539 U.S. at 534; Yarbrough v. Warden, 269 Va. 184, 197-202, 609 S.E.2d 30, 38-40 (2005); Lovitt v. Warden, 266 Va. 216, 250-57, 585 S.E.2d 801, 821-26 (2003).

22

one Stacey Lynn Reed, and, having found unanimously and beyond a reasonable doubt after consideration of his history and background that there is a probability that he would commit criminal acts of violence that would constitute a continuing serious threat to society and having found unanimously and beyond a reasonable doubt that his conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman in that it involved . . . [d]epravity of mind . . . [a]ggravated battery to the victim beyond the minimum necessary to accomplish the act of murder [a]nd having considered all the evidence in mitigation of the offense, unanimously fixed his punishment at death."

The day before Powell committed these gruesome crimes, he went to the victims' home and surveyed the interior of the house. He returned the next day and tried to rape Stacey, who struggled with him. He stabbed her in the heart, twisted the knife, and reinserted the knife in her heart. He stomped upon her throat and he placed the entire weight of his body on her throat until she died. Next, he drank a glass of iced tea, smoked a cigarette, and waited for Stacey's younger 14-year-old sister to return home. When Kristie arrived, Powell directed her to her sister's body, forced her downstairs into the basement, and raped her on the floor. He then tied her hands and feet while she was naked, choked her until she was unconscious, stabbed her in the stomach, and slashed her neck numerous times in an attempt to kill her.

We conclude that the jury's finding that Powell's conduct was "outrageously or wantonly vile, horrible or inhuman in

23

that it involved . . . [d]epravity of mind [and]. . . [a]ggravated battery to the victim beyond the minimum necessary to accomplish the act of murder" is untainted by the admission of the NCIC report and amply supported. The jury's consideration of Powell's past criminal offenses is related to the issue of future dangerousness but has nothing to do with vileness of the act which serves as the basis of the capital offense. The instruction given to the jury on this issue and the verdict form confirm that the jury was instructed to consider the defendant's criminal history only with regard to future dangerousness. For example, the jury was instructed that it could fix the punishment at death if it found:

> "1. That, after consideration of his history and background, there is a probability that he would commit criminal acts of violence that would constitute a continuing serious threat to society; or
> "2. That his conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman, in that it involved torture, depravity of mind or aggravated battery to the victim beyond the minimum necessary to accomplish the act of murder."

Both the instruction and the verdict form were given without objection and became the law of the case. Spencer v. Commonwealth, 240 Va. 78, 89, 393 S.E.2d 609, 616 (1990). Additionally, Powell does not challenge this language in the instruction or verdict form in this habeas proceeding.

24

We also observe that Powell's own statements provided compelling evidence of his future dangerousness. Powell's letters and confessions to police demonstrate that he planned to kill the victims' entire family and that he continued to taunt the victims' family even while he was incarcerated awaiting his capital murder trial by sending the victims' mother a photograph of a partially-nude woman who resembled the deceased victim. Powell also sought to intimidate Kristie by having another individual contact her by telephone and tell her that she would be killed if she testified against Powell. He also bragged about his desire to kill people who are non-Caucasian.

As the Supreme Court instructed in Strickland, "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." 466 U.S. at 696. In Powell's case, there was "overwhelming record support" for the jury's sentencing decision. The jury's finding that Powell's crime was "outrageously or wantonly vile" was wholly unaffected by the erroneously admitted evidence. Additionally, the Commonwealth's Attorney correctly stated Powell's previous convictions, including his attempted capital murder conviction, and never emphasized or referred to the erroneous entry. "Taking the unaffected findings as a given, and taking

due account of the effect of the errors on the remaining findings," we hold that Powell has not "met the burden of showing that the decision reached would reasonably likely have been different absent the errors."  Id.

Upon our review of the totality of the evidence that Powell constitutes a continuing serious threat to society and that his acts were vile in that he committed an aggravated battery to the victim beyond the minimum necessary to accomplish the act of murder, and that he demonstrated depravity of mind, we conclude that Powell failed to satisfy the high standard of prejudice established by the Supreme Court's holding in Strickland.  Accordingly, we will dismiss the petition for habeas corpus.

Dismissed.

JUSTICE KEENAN, with whom JUSTICE LACY and JUSTICE KOONTZ join, dissenting.

I respectfully dissent and would hold that Powell is entitled to a new sentencing hearing.  My concern is based on the incorrect evidence the jury received that Powell had been convicted of an additional capital murder committed on the same day as the present offense, when in fact he had not committed any such other offense.  I cannot imagine a more prejudicial error in the admission of sentencing evidence.

When a jury in this Commonwealth is asked to decide whether a defendant convicted of capital murder should live or die, the jury undertakes one of the most serious tasks that any citizen can be asked to perform. An essential component of this decision is the jury's consideration of the defendant's criminal record.

Under Code § 19.2-264.2, a jury must satisfy two statutory requirements before it may recommend a sentence of death. Ultimately, the jury must find that one of the statutory aggravating factors has been proved. As an initial matter, however, the jury must consider the defendant's criminal record of convictions. Code § 19.2-264.2 requires that the jury analyze the statutory aggravating factors only "after consideration of the past criminal record of convictions of the defendant." Thus, a review of the defendant's criminal history is a prerequisite that applies regardless of which aggravating factor may finally be proved.

Here, the sentencing proceedings conducted by the circuit court failed to comply with the first requirement of Code § 19.2-264.2, which plainly contemplates that the jury will have considered an <u>accurate</u> record of a defendant's criminal history before recommending that the defendant receive the death sentence. Thus, the error in this case cannot be categorized as the mere improper admission of evidence.

27

Because of this failure in the sentencing process, the jury was unable to perform a mandatory duty assigned by statute.

In my opinion, the majority's holding further suffers from extensive speculation and a failure to address the broad discretion afforded a jury in making a death penalty determination.  Even when a jury has determined that the Commonwealth has proved both statutory aggravating factors beyond a reasonable doubt, the jury still can recommend that the defendant serve a sentence of life imprisonment.  See Code §§ 19.2-264.2, -264.4; Smith v. Commonwealth, 219 Va. 455, 472, 248 S.E.2d 135, 145 (1978); see also Tuggle v. Thompson, 57 F.3d 1356, 1371 (4th Cir.), vacated on other grounds by Tuggle v. Netherland, 516 U.S. 10 (1995); Briley v. Bass, 750 F.2d 1238, 1241 (4th Cir. 1984).  The jury may impose a sentence of life imprisonment for any reason based on any mitigating circumstance, and is not required to weigh the evidence in mitigation against the evidence in aggravation of the crime.  See Swann v. Commonwealth, 247 Va. 222, 236-37, 441 S.E.2d 195, 205 (1994); see also Tuggle, 57 F.3d at 1362. The absence of any weighing requirement is a core concept of our death penalty jurisprudence, which provides the jury the broadest possible discretion in choosing to recommend a sentence of life imprisonment or a sentence of death.  Thus, the two main arguments on which the majority relies, namely,

28

the weight of the Commonwealth's evidence against Powell, and the jury's determination that the Commonwealth proved both statutory aggravating factors, are not dispositive of the issue before us.

A jury's exercise of this very broad sentencing discretion is particularly difficult to assess under the Strickland test because the jury can sentence a defendant to life imprisonment even in the face of overwhelming evidence in aggravation of a crime. Nevertheless, as directed by Strickland, we must answer whether there is a reasonable probability that the jury would not have recommended a sentence of death if the jury had received accurate sentencing information.

The Supreme Court provided guidance in Strickland when it defined the term "reasonable probability." The Court stated: "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694; see Lovitt v. Warden, 266 Va. 216, 250, 585 S.E.2d 801, 821 (2003); Hedrick v. Warden, 264 Va. 486, 497, 570 S.E.2d 840, 847 (2002). The Court has further elaborated that the reasonable probability standard is a standard lower than "more likely than not." See Holland v. Jackson, 542 U.S. 649, 654 (2004); Woodford v. Visciotti, 537 U.S. 19, 22 (2002).

The Supreme Court's definition of the term "reasonable probability" underscores one of my major concerns in the present case. In my view, a court cannot have confidence in the outcome of a death penalty determination when the court's Strickland analysis relies on speculation. Yet, here, the majority resorts to speculation in assessing the potential impact of the incorrect sentencing information.

The majority opines that the jury ultimately would have been able to determine that the additional capital murder conviction shown on the NCIC report was an erroneous entry. Although the majority, as skilled members of the legal profession, can easily identify this inaccuracy, the majority simply speculates that the jurors had sufficient knowledge of the law to reach the same conclusion. Based on the evidence presented, the jurors could easily have viewed the NCIC report as proof that Powell committed a separate capital offense in Prince William County on the same day, brutally murdering an additional victim.

The majority also suggests that because the prosecutor did not reference the incorrect sentencing information when he summarized the contents of the NCIC report at the time of its admission into evidence, his oral summary of Powell's crimes would likely have resolved any confusion created by the erroneous written exhibit. The majority further relies on

defense counsel's comments, noting that he indicated that Powell had been convicted of one capital murder offense.  The majority's reasoning, however, is flawed because it requires an assumption that the jury disregarded the instructions of the circuit court.  In every jury trial in this Commonwealth, the court instructs the jury that the statements of counsel are not evidence in the case and may not be considered as such.  Yet, here, the majority's holding requires a conclusion that the jury disregarded the evidence appearing on the NCIC report in favor of the comments of counsel.  Thus, the majority's rationale extends beyond simple speculation and also requires an improper conclusion that the jury rejected duly admitted evidence in favor of counsels' remarks.

Because a Strickland analysis cannot rest on such speculation and improper assumptions, I am required to conclude that the jury viewed the NCIC report as uncontested evidence that Powell had committed another capital murder. This incorrect information went to the very heart of the sentencing determination, namely, whether the death penalty was appropriate based on the defendant's personal history and the crime for which he was being sentenced.

I would hold that the jury's receipt of incorrect information of such magnitude negates any reasonable

confidence in the outcome of Powell's sentencing proceeding. My concerns, however, reach far beyond the present case.

In my opinion, such a serious mistake in a capital murder case may well cause the public to question whether our courts adequately ensure the fair application of our death penalty statutes. When a jury has determined that a defendant should die for the commission of a heinous murder, the public should be able to have confidence that this determination was made without fundamental errors having occurred in the sentencing process. A central premise in support of the death penalty is that society exacts this penalty only in rare instances, and only after the penalty has been determined with full and fair adherence to constitutional, statutory, and evidentiary safeguards. Because those safeguards failed in this case when a very able prosecutor made an unintentional error, I would grant a writ of habeas corpus limited to the award of a new sentencing proceeding.