PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

PAUL WARNER POWELL,

   *Petitioner-Appellant,*

v.

LORETTA K. KELLY, Warden,
Sussex I State Prison,

   *Respondent-Appellee.*

No. 08-3

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
T. S. Ellis, III, Senior District Judge.
(1:07-cv-00059-TSE-TRJ)

Argued: December 3, 2008

Decided: April 15, 2009

Before MOTZ, GREGORY, and SHEDD, Circuit Judges.

---

Affirmed by published opinion. Judge Shedd wrote the majority opinion, in which Judge Motz joined. Judge Gregory wrote a separate opinion concurring in part and dissenting in part.

---

## COUNSEL

**ARGUED:** Jonathan P. Sheldon, DEVINE, CONNELL & SHELDON, P.L.C., Fairfax, Virginia, for Appellant. Katherine Baldwin Burnett, OFFICE OF THE ATTORNEY GEN-

ERAL OF VIRGINIA, Richmond, Virginia, for Appellee. **ON BRIEF:** Robert L. Jenkins, Jr., BYNUM & JENKINS, P.L.L.C., Alexandria, Virginia, for Appellant. Robert F. McDonnell, Attorney General of Virginia, Jerry P. Slonaker, Senior Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee.

---

## OPINION

SHEDD, Circuit Judge:

Paul Warner Powell, a Virginia capital inmate, appeals the denial of his petition for a writ of habeas corpus. We granted a certificate of appealability ("COA") on three issues: (1) whether the imposition of a death sentence is precluded by the Double Jeopardy Clause of the Fifth Amendment of the United States Constitution; (2) whether trial counsel rendered ineffective assistance by failing to object to the admission of an inaccurate National Crime Information Center report; and (3) whether trial counsel rendered ineffective assistance by failing to develop and present available mitigating evidence. For the following reasons, we affirm.

I.

A.

We begin with a summary of the facts pertaining to the underlying crimes, as articulated by the Supreme Court of Virginia in Powell's first direct appeal:

"Powell was acquainted with Stacey Lynn Reed ("Stacey") for two and a half years prior to the commission of the crimes in question. Kristie Erin Reed ("Kristie"), Stacey's younger sister, described her sister and Powell as '[f]riends.' Powell,

who was 20 years old at the time of the murder, had wanted to date Stacey, who was 16 years old, but recognized that she was underage and he 'could go to jail for that.'

"Powell, a self-avowed 'racist and white supremacist,' was aware that Stacey, who was white, was dating Sean Wilkerson, who is black. Wilkerson had recently moved to another locality, but he and Stacey remained in contact. Stacey was a member of her high school's Junior Reserve Officer's Training Corps and planned to attend a military ball with Wilkerson.

"Just before noon on January 29, 1999, Stacey arrived home from school early, having completed her examinations that were being given that day. Powell was waiting for her at her home when she arrived. When Powell learned that Robert Culver, a friend of the girls' mother, would be home shortly for lunch, Powell left and returned at about 12:45 p.m., after Culver had left. When Powell returned, he was armed with a 'survival' knife, a 'butterfly' knife, a box cutter, and a 9-millimeter pistol.

"Stacey was talking to Wilkerson on the telephone. After Stacey ended the telephone conversation, Powell confronted her about her relationship with Wilkerson. He demanded that Stacey end her relationship with Wilkerson. According to Powell, he and Stacey argued, and the argument grew into a struggle. Powell drew the survival knife from his belt and Stacey 'got stuck.' Powell denied stabbing Stacey deliberately. The struggle continued briefly until Stacey collapsed on the floor in her sister's bedroom.

"Although Powell did not know whether Stacey was still alive, he made no effort to determine her condition or call for medical assistance. Powell 'wandered around the house, got some iced tea, had a cigarette.' Kristie arrived home from school shortly after 3 p.m. and was met at the door of the home by Powell. Powell told her that Stacey was in her room,

but moments later Kristie discovered her sister's body in Kristie's bedroom. She dropped her schoolbooks and began to cry.

"Powell ordered Kristie to go to the basement. Kristie, who knew that Powell was usually armed, complied because she 'didn't want to die.' In the basement, Powell ordered Kristie to remove her clothes and to lie on the floor. Powell then raped Kristie, and she 'begg[ed] him not to kill her.' Powell later admitted that he knew that Kristie, who was 14 years old at the time of the rape, had been a virgin.

"While Powell and Kristie were in the basement, Mark Lewis, a friend of Kristie, came to the house and knocked on the door. When Powell heard the knock, he tied Kristie's legs together and tied her hands behind her back with shoelaces he cut from her athletic shoes. Powell then dressed and went upstairs.

"While Powell was upstairs, Kristie managed to loosen the bonds on her hands and attempted to 'scoot across the floor to hide' under the basement steps. Hearing Powell coming back to the basement, she returned to the position on the floor where he had left her. Powell then strangled Kristie with a shoelace and she lost consciousness. While she was unconscious, Powell stabbed Kristie in the abdomen and slit her wrists and throat.

"Powell returned upstairs, searching for 'anything worth taking.' He fixed another glass of iced tea, which he took with him when he left the home a short time later. Powell went to a friend's house and then drove with the friend to the District of Columbia to buy crack cocaine.

"Kristie regained consciousness sometime after Powell had left her home. About 4:10 p.m., she heard Culver return home, and she called out his name. Culver discovered Kristie in the basement, called the 911 emergency response telephone number, and began rendering first aid to her. He later discov-

ered Stacey's body upstairs. Shortly thereafter, paramedics arrived. In response to a question from one of them, Kristie identified Powell as her attacker. Powell was arrested later that day at the home of his friend's girlfriend, where he and the friend had gone after buying drugs.

"Kristie was transported by helicopter to Inova Fairfax Hospital where she received treatment for her injuries. It was ultimately determined that the wounds to her throat and abdomen each came within one centimeter of severing a major artery which likely would have caused her death.

"An autopsy revealed that Stacey had died from a knife wound to the heart. The medical examiner testified that there was a single entrance wound and two exit wounds indicating that the knife had been withdrawn, at least partially, and then reinserted into the heart. One wound path pierced the left ventricle and the other went through both the left and right ventricles, exiting the heart at the back of the right ventricle.

"Stacey's body also exhibited a number of bruises on the head, chest, abdomen, back, arms, and legs, abrasions on the face, a stab wound to the back, and a cut and scrapes on the left forearm. The autopsy further revealed that Stacey had been struck on the head with sufficient force to cause bleeding inside her scalp and in the membranes surrounding her brain prior to death. These injuries were not consistent with Stacey merely having fallen during a struggle.

"The DNA profile obtained from the blood found on Powell's survival knife was consistent with the DNA profile of Stacey's blood. The DNA profile obtained from sperm fractions from swabs taken from Kristie's vagina and perianal area was the same profile as that obtained from Powell's drawn blood sample.

"While in jail, Powell wrote letters to friends in which he admitted having committed the murder, rape, and attempted

murder because of Stacey's relationship with a black man. He further claimed that he had planned to kill Stacey's family and steal the family's truck. Powell also wrote to a female friend and asked her to 'get one of [her] guy friends . . . to go to a pay phone and call Kristie and tell her [that] she better tell the cops she lied to them and tell her [that] she better not testify against me or she's gonna die.'

"Powell told another inmate that he had become angry with Stacey when she refused to have sex with him after talking to Wilkerson. Powell told the inmate that he stabbed Stacey twice and that when he attempted to cut Kristie's throat, his knife was too dull, '[s]o he started stepping on her throat trying to stomp her throat.' To another inmate, Powell described Stacey's killing as a 'human sacrifice' and expressed satisfaction in having raped a virgin." *Powell v. Commonwealth*, 552 S.E.2d 344, 347-348 (Va. 2001) ("*Powell I*").

## B.

In the original indictment, Powell was charged with a single count of capital murder in which the gradation crime was the commission, or attempted commission, of robbery.[1] In 2000, Powell was convicted of the capital murder of Stacey and sentenced to death. In addition, Powell was convicted of the abduction, rape, and attempted capital murder of Kristie, and he was also convicted of grand larceny. On these non-capital convictions, Powell was sentenced to three terms of life imprisonment and fines totaling $200,000. Powell was acquitted of robbery, attempted robbery, and three firearm charges.

In June 2001, the Supreme Court of Virginia reversed Pow-

---

[1]Virginia's capital murder statute includes fifteen gradation offenses, which when accompanied with the "willful, deliberate, and premeditated killing" of a person, make the defendant eligible for the death penalty. *See* Va. Code § 18.2-31.

ell's capital murder conviction, holding that the trial judge erred by allowing a pretrial amendment of the capital murder indictment to charge two new gradation crimes that were not considered by the grand jury. *See Powell I*, 552 S.E.2d at 355-56. The additional gradation crimes were the commission, or attempted commission, of rape and the commission, or attempted commission, of sodomy. The court held that including these additional counts of capital murder expanded the nature and character of the charges against Powell in a manner not allowed by Va. Code § 19.2-231. *Id.* at 357.[2]

Based on the circumstances then existing, the state supreme court also concluded that there was no basis to try Powell for capital murder on remand. *Id.* at 363. In making this determination, the court noted that Powell had been acquitted of robbery or attempted robbery, thereby eliminating these offenses from being gradation offenses for the capital murder charge. Further, the court held that "the evidence was insufficient to support [Powell's] conviction for the capital murder of Stacey 'during the commission of or subsequent to' the rape of Kristie" because the evidence clearly showed the rape of Kristie occurred *after* the murder of Stacey. *Id.* at 361. Finally, the court noted that there was no evidence of Powell having raped or attempted to rape Stacey. *Id.* at 363.

## C.

While awaiting retrial and believing that he could no longer be tried for capital murder, Powell wrote the Commonwealth's Attorney and disclosed new evidence regarding the circumstances surrounding Stacey's death. In Powell's second

---

[2]Va. Code § 19.2-231 allows the government to amend an indictment to correct a defect in the form of the indictment or a variance between the allegations and the evidence offered in proof thereof, so long as the amendment does not change the nature or character of the offense charged.

direct appeal, the Supreme Court of Virginia summarized the events as follows:[3]

"On October 21, 2001, Powell wrote an obscenity-laced letter to the Commonwealth's Attorney who had prosecuted Powell in his first trial. Powell stated in the letter that, because he believed he could not be retried for capital murder, 'I figured I would tell you the rest of what happened on Jan. 29, 1999, to show you how stupid all y'all . . . are.' Admitting that he 'planned to kill the whole family' on that day, Powell further stated that 'I had other plans for [Stacey] before she died.' Powell described how he had attempted to initiate consensual sexual intercourse with Stacey, which he had previously admitted. Powell then revealed that when Stacey resisted his advances, he pushed her onto her bed and, while sitting on top of her, told Stacey 'that we could do it the easy way or the hard way.'

"Powell then described how Stacey had 'started fighting with me and clawed me [sic] face.' Powell stated that he 'slammed her to the floor . . . sat on top of her and pinned her hands down again.' Powell claimed that Stacey relented 'and I told her if she tried fighting with me again I would kill her.'

"Continuing, Powell stated that, at his direction, Stacey began to disrobe, but stopped when the telephone rang. Stacey put her clothes back on so that she could answer the telephone. Powell refused to allow Stacey to answer the telephone and ordered her to resume disrobing. When she refused, Powell 'pushed her back and pulled out [his] knife.' When Stacey attempted to leave the bedroom, Powell stabbed her. Stacey fell back and Powell removed the knife. Stacey then stumbled to another bedroom and collapsed. Powell 'saw that she was still breathing' and 'started stomping on her throat' until he 'didn't see her breathing anymore.'

---

[3]For purposes of clarity, we have omitted any footnotes within this summary that are irrelevant to the disposition of the issues before us.

"Armed with this new evidence, the Commonwealth elected to *nolle prosequi* the indictment in the remanded case, under which it was limited to trying Powell for first degree murder under our mandate, and sought a new indictment against Powell for capital murder. On December 3, 2001, the grand jury returned an indictment charging Powell with the capital murder of 'Stacey Lynn Reed during the commission of or subsequent to the attempted rape of Stacey Lynn Reed.'

"On April 24, 2002, Powell filed a motion to dismiss the December 3, 2001 indictment. Powell asserted that '[w]hen the Supreme Court of Virginia issues an opinion concerning a case, this opinion becomes the law of the case' and, thus, the directive of the opinion and mandate from this Court in his first appeal limited his retrial to a charge no greater than first degree murder, regardless whether that trial was conducted under the original indictment or a new indictment. The Commonwealth filed a response to this motion, asserting that the judgment of this Court in Powell's first appeal was not applicable to the December 3, 2001 indictment because Powell had 'never [previously] been charged with the capital murder of Stacey Reed in the commission or attempted commission [of] sexual assault against [Stacey Reed] because, at the time of [Powell's first] trial, no such evidence existed.' Accordingly, the Commonwealth contended that the December 3, 2001 indictment was 'a new charge, one that has never been litigated in trial nor considered by the Virginia Supreme Court. Following a hearing on this and other pre-trial matters, the trial court overruled Powell's motion to dismiss the indictment in an order dated May 6, 2002.

"On May 17, 2002, Powell filed a second motion to dismiss the December 3, 2001 indictment. . . . The import of Powell's argument was that his prior trial and the reversal of his conviction by [the Supreme Court of Virginia] acted as an 'implied' or 'judicial' acquittal of the attempted rape of Stacey, thus barring his retrial for her capital murder premised on that gradation offense. The Commonwealth responded that

the issue whether Stacey had been the victim of a sexual assault was not before the jury in his first trial because the bill of particulars provided at Powell's request indicated that only Kristie was the victim of the sexual assault gradation offenses charged in the amended indictment. Similarly, the Commonwealth contended that our comments concerning the insufficiency of the evidence to prove a sexual assault or attempted sexual assault against Stacey were not directed toward any finding of the jury, but to the contrary were indicative of the fact that the jury did not consider whether Stacey had been the victim of such an assault or attempt.

"On June 5, 2002, the trial court held a hearing on Powell's second motion to dismiss the indictment. After hearing argument, the trial court stated that by identifying Kristie as the victim of the rape or attempted rape in the bill of particulars, the Commonwealth had clearly identified her as the victim of those gradation crimes in the amended indictment for capital murder. The trial court also agreed with the Commonwealth that this Court's reference to the lack of evidence to prove any sexual assault or attempted sexual assault against Stacey was merely a comment on the record, and not an assertion that this was a theory of the case presented by the Commonwealth in Powell's first trial. On July 3, 2002, the trial court entered an order overruling Powell's second motion to dismiss the indictment." *Powell v. Commonwealth*, 590 S.E.2d 537, 544-545 (Va. 2004) ("*Powell II*").

### D.

In January 2003, Powell was convicted of the capital murder of Stacey during the commission of rape or attempted rape of Stacey and sentenced to death. Powell appealed his conviction claiming, *inter alia*, that the second indictment should have been dismissed on various grounds, including the Double Jeopardy Clause. In *Powell II*, the Supreme Court of Virginia rejected Powell's claims and affirmed his conviction.

Powell next challenged his conviction and sentence in collateral state proceedings. *See Powell v. Warden of Sussex I State Prison*, No. 042716, 2005 WL 2980756 (Va. 2005) ("*Powell III*"). Powell raised numerous claims that the state supreme court found were procedurally defaulted, including an allegation that the Commonwealth violated his right against double jeopardy by trying him twice for the same offense. Among the new claims Powell asserted was an objection to the admission of a National Crime Information Center report ("NCIC report") containing inaccurate information about Powell's criminal history during sentencing and a claim that his trial counsel provided him ineffective assistance by failing to investigate and present compelling mitigating evidence. The Supreme Court of Virginia denied relief on all grounds. Subsequently, the state supreme court granted rehearing on the question of whether counsel was ineffective in the sentencing phase for failing to object to the NCIC report. *See Powell v. Warden of Sussex I State Prison*, 634 S.E.2d 289 (Va. 2006) ("*Powell IV*"). Ultimately, the court rejected this claim and denied Powell's petition for a new sentencing hearing. *Id.*

Thereafter, Powell filed a petition for a writ of habeas corpus in federal district court. *See* 28 U.S.C.A. § 2254. Powell asserted nine claims for relief. *See Powell v. Kelly*, 531 F.Supp.2d 695, 705 (E.D.Va. 2008) ("*Powell V*"). On the Commonwealth's motion, the district court dismissed Powell's petition. As noted, we granted a COA on three issues: (1) whether the imposition of a death sentence is precluded by the Double Jeopardy Clause; (2) whether trial counsel was constitutionally ineffective in failing to object to the admission of an inaccurate NCIC report; and (3) whether trial counsel was constitutionally ineffective in failing to develop and present available mitigating evidence. We address each in turn.

## II.

## A.

We review the district court's dismissal of Powell's petition *de novo*. *See Tucker v. Ozmint*, 350 F.3d 433, 438 (4th Cir. 2003). However, under 28 U.S.C. § 2254, "the scope of our review is highly constrained." *Jackson v. Johnson*, 523 F.3d 273, 276 (4th Cir. 2008). We may only grant Powell relief if the state court's adjudication of his claims (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).

The "contrary to" and "unreasonable application" clauses of § 2254(d) have independent meanings. *Tucker*, 350 F.3d at 438. A state court's decision is "contrary to" clearly established federal law under § 2254(d)(1) when it "applies a rule that contradicts the governing law set forth" by the United States Supreme Court, or "confronts a set of facts that are materially indistinguishable from a decision of . . . [the Supreme] Court and nevertheless arrives at a result different from . . . [that] precedent," *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

A state court's decision involves an "unreasonable application" of clearly established federal law under § 2254(d)(1) "if the state court identifies the correct governing legal rule from . . . [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407. This standard is quite deferential: "The state court's application of clearly established federal law must be 'objectively unreasonable,' and 'a federal habeas court may not issue the writ simply because that court concludes in its

independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" *Robinson v. Polk*, 438 F.3d 350, 355 (4th Cir. 2006) (quoting *Williams*, 529 U.S. at 411). Moreover, when "assessing the reasonableness of the state court's application of federal law, the federal courts are to review the result that the state court reached, not whether [its decision] [was] well reasoned." *Wilson v. Ozmint*, 352 F.3d 847, 855 (4th Cir. 2003) (quotation marks omitted).

Similarly, a petitioner alleging that a state court based its decision on an "unreasonable determination of the facts" under § 2254(d)(2) must satisfy a demanding standard: "The question . . . is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable — a substantially higher threshold." *Schriro v. Landrigan*, 127 S.Ct. 1933, 1939 (2007). Finally, § 2254(e)(1) provides that a state court's factual decisions "shall be presumed to be correct" and that the petitioner bears the burden of "rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C § 2254(e)(1).[4]

B.

We begin with Powell's double jeopardy claim. Powell asserts two arguments in this regard. First, he contends that the gradation offenses charged at both trials were the same – that is, he was tried for capital murder during the rape or attempted rape of Stacey in both trials. Alternatively, if we decide the same offense was not charged in both trials, Powell nevertheless argues that the crime charged in the second trial had actually been litigated in the first trial, even if not for-

---

[4]Moreover, in cases proceeding under either § 2254(d)(1) or § 2254(d)(2), we can only grant the petitioner relief if the error had "a substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quotation marks omitted).

mally charged. Conversely, the Commonwealth argues that the capital murder charges were different in each trial – that is, Powell was charged with the capital murder of Stacey during the rape or attempted rape of Kristie in the first trial and charged with the capital murder of Stacey during the rape or attempted rape of Stacey in the second trial.

The Double Jeopardy Clause prohibits any person from being put in jeopardy twice for the same offence. *See* U.S. Const. amend. V. The Supreme Court held in *Sanabria v. United States*, 437 U.S. 54, 64 (1978) (citing *Ball v. United States*, 163 U.S. 662, 670 (1896)), that the Fifth Amendment prohibits subjecting a defendant to a second trial on the same offense for which he has been acquitted. In *Sanabria*, the Court stated that when a defendant is charged with several violations of the same criminal statute, the appropriate double jeopardy inquiry is whether the legislature intended the charged violations to be separate "allowable unit[s] of prosecution." *Id.* at 70. Stated differently for purposes of this case, the issue is whether the Virginia legislature intended that a defendant could be charged with multiple counts of capital murder where there is one murder victim accompanied by multiple gradation offenses.

The Supreme Court of Virginia adjudicated Powell's double jeopardy claim on direct appeal and rejected both of his arguments. *Powell II*, 590 S.E.2d 537. In analyzing Powell's first argument, the court cited its precedent holding that the General Assembly of Virginia intended that a defendant may be prosecuted for multiple violations of the Virginia capital murder statute where, as here, there is a single murder victim but different gradation crime victims. *Id.* at 553 (citing *Payne v. Commonwealth*, 509 S.E.2d 293 (Va. 1999)). The state court found that the capital murder charge in the second trial alleging the murder of Stacey and attempted rape of Stacey was a distinct and separate crime from the offense charged in the first trial – namely, the capital murder of Stacey during the commission of, or subsequent to, Powell's rape of Kristie.

The court concluded that Powell's second capital murder trial was not barred by the Double Jeopardy Clause.

As to Powell's first argument, we hold that the Virginia Supreme Court's decision was consistent with Supreme Court precedent and was not an unreasonable application of federal law. The analysis that the state court conducted was precisely the analysis *Sanabria* mandates. Therefore, the decision was not contrary to clearly established federal law. Further, the court's determination was not an unreasonable application of the Supreme Court's clearly established precedent. *Sanabria* requires a court to determine whether the legislature intended to allow multiple charges under the statute. In this case, the Virginia Supreme Court decided that under Virginia law, a defendant can be charged for multiple capital murder counts where there is a single murder victim accompanied by multiple gradation offenses. *Id.* Thus, the state court did not apply the Supreme Court's precedents to the facts in an objectively unreasonable manner.

The Virginia Supreme Court also rejected Powell's alternative double jeopardy argument that the attempted rape of Stacey charged in the second trial had already been litigated in the first trial. The court relied on settled state law that Stacey's attempted rape was not at issue in the first trial because the Commonwealth's bill of particulars limited the first trial solely to the capital murder of Stacey subsequent to, or in the commission of, the rape of Kristie. *See Powell II*, 590 S.E.2d at 554 (holding that "by naming a specific victim of the gradation offense in a bill of particulars, jeopardy will attach only to the capital murder charge as made specific by the bill of particulars").[5] In reaching this result, the court fol-

---

[5]A defendant does not have a right to a bill of particulars in Virginia. *See Quesinberry v. Commonwealth*, 402 S.E.2d 218, 223 (Va. 1991) (holding whether the Commonwealth is required to file a bill of particulars lies within the discretion of the trial court). Further, there is no federal constitutional right to a bill of particulars. *See United States v. Bales*, 813

lowed its precedent holding that "the bill of particulars and
the indictment must be read together" as specifying the crime
charged. *See Livingston v. Commonwealth*, 36 S.E.2d 561,
565 (Va. 1946). The court recognized that the original indict-
ment in the first trial did not identify the name of the victim
of the gradation offense. However, upon Powell's request, the
Commonwealth specified in a bill of particulars that the
charged offense only involved Kristie as the victim of the gra-
dation offense. Thus, the court concluded that Powell was
only tried in the first trial for the capital murder of Stacey dur-
ing the commission of, or subsequent to, the rape of Kristie.
*See Powell II*, 590 S.E.2d 537. Based on established state law
principles, the court ruled that Powell's second trial was not
a double jeopardy violation because the indictment in the sec-
ond trial charged a crime not charged in the first trial.

Powell argues that this holding was an unreasonable deter-
mination of the facts in light of the evidence presented at trial.
He claims, among other arguments, that the bill of particulars
did not limit the charge because the jury heard argument from
the prosecutor that Powell "wanted something more" from
Stacey, the jury heard testimony from witnesses suggesting
that Stacey refused to have sex with Powell, and the jury was
not told about the limitation of the bill of particulars.

---

F.2d 1289 (4th Cir. 1987) (internal citations omitted). The purpose of a
bill of particulars is "to state sufficient facts regarding the crime to inform
an accused in advance of the offense for which he is to be tried." *Quesin-
berry*, 402 S.E.2d at 223 (citing *Hevener v. Commonwealth*, 54 S.E.2d
893, 899 (Va. 1949)). Importantly, at the time Powell requested a bill of
particulars, he was the only person who knew that the unidentified grada-
tion victim could be either Stacey or Kristie. Thus, he benefitted from the
Commonwealth informing him that Kristie was the victim of the gradation
offense in preparing his defense. Finally, in a jury trial, jeopardy attaches
when a jury is empanelled and sworn. *Serfass v. United States,* 420 U.S.
377, 388 (1975) (citing *Downum v. United States*, 372 U.S. 734 (1963)).
It is clear that at the time the jury was sworn in Powell's first trial, Powell
was only in jeopardy, so far as is relevant here, for the murder of Stacey
during the rape of Kristie as specified by the bill of particulars.

Powell's argument falls short of showing an unreasonable determination of the facts in light of the evidence presented. First, under settled Virginia precedent, the court determined that, as a matter of state law, Powell was not charged with the attempted rape of Stacey in the first trial. Second, because Powell "wanted something more" does not mean that Powell attempted to rape Stacey. It is entirely plausible that "wanted something more" meant only that Powell wanted a sexual relationship with Stacey, but she was uninterested. This is not a basis for a charge of attempted rape. Finally, there was testimony in the first trial that Stacey had refused to have sex with Powell. Again, rejecting sexual advances, without more, is not evidence of an attempted rape. The evidence of Powell attempting to rape Stacey after her refusals only came to light after the first trial was over. If the Commonwealth had been prosecuting Powell for this gradation offense, it would not have restricted the bill of particulars to identifying only Kristie as the victim of the gradation offense. Clearly, the state court's determination that the charge that Powell had attempted to rape Stacey was not litigated in the first trial was not an unreasonable determination of the facts in light of the evidence presented.[6] Accordingly, we find no error in the state

---

[6] The dissent's criticism of our decision rests on a misunderstanding of the facts of this case. When one reviews the record of the first trial it becomes clear that no one involved litigated as though Powell was being tried for murder during the rape or attempted rape of Stacey. The Commonwealth certainly did not offer evidence on that purported charge during that trial. Moreover, the bill of particulars unambiguously identified Kristie only as the victim of the rape or attempted rape, and Powell's trial counsel clearly recognized this fact as evidenced by their comments to the court and to the jury. *See, e.g.*, Record, Vol. 2, at 1068 ("The rape involved Kristi[e], not Stac[ey]"); Record, Vol. 2, at 1052 ("Stac[ey] is the victim or alleged victim on the capital murder, the robbery, and the attempted robbery. And . . . Kristi[e] the victim or alleged victim on rape . . ."); Record, Vol. 2, at 995 ("and on the rape allegation, obviously, Kristi[e] Reed"); Record, Vol. 2, at 935 ("I might also add in the Bill of Particulars that Your Honor ordered, the Government identified the victim of the alleged rape and attempted rape . . . as being Kristie, not Stac[ey], but Kristie").

court's application of federal law.[7]

## C.

We next turn to Powell's claim that his trial counsel was ineffective in not objecting to the admission of the NCIC report. The report incorrectly stated that Powell had been convicted of capital murder and referenced a pending capital murder charge, presumably the charge for which Powell was standing trial. Finally, the report contained correct entries that Powell asserts were inadmissible at trial, such as charges that were *nolle prossed* or for which Powell was found not guilty.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court articulated the relevant standard for a claim of ineffective assistance of counsel:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.

---

The trial judge likewise recognized this fact. For example, the trial judge instructed the jury that "[s]exual intercourse means an actual penetration, no matter how slight, of the Defendant's penis into the sexual organ of Kristi[e] Reed." Record, Vol. 2, at 1024-25. Although the dissent contends that the trial judge's response to the jury question suggests that he was confused as to the identity of the rape victim, the proceedings that followed the receipt of the question demonstrate that the judge was not confused on that point. It is clear that the trial judge was not concerned with who the victim of the rape was; instead, he was concerned with the timing of the rape of Kristie and whether the murder of Stacey could be found to have occurred "subsequent to" or "during the commission of" the rape of Kristie. *See* J.A. 53-55, 62.

[7]Related to his double jeopardy claim, Powell argues that his second trial is barred by principles of collateral estoppel. *See Ashe v. Swenson*, 397 U.S. 436, 443 (1970). Although the state argues this claim is procedurally defaulted, we find that it lacks merit in any event. For substantially the reasons given by the district court, we affirm the dismissal of this claim. *See Powell V*, 531 F.Supp.2d at 724-25.

> First, the defendant must show that counsel's perfor-
> mance was deficient. This requires showing that
> counsel made errors so serious that counsel was not
> functioning as the 'counsel' guaranteed the defen-
> dant by the Sixth Amendment. Second, the defen-
> dant must show that the deficient performance
> prejudiced the defense. This requires showing that
> counsel's errors were so serious as to deprive the
> defendant of a fair trial, a trial whose result is reli-
> able. Unless a defendant makes both showings, it
> cannot be said that the conviction or death sentence
> resulted from a breakdown in the adversary process
> that renders the result unreliable.

*Id.* at 687.

The Supreme Court of Virginia found, in its first opinion denying Powell's state habeas petition, that there was a single capital murder conviction entry listed on the NCIC report. *Powell III*, 2005 WL 2980756, at 14. The court determined this entry referenced Powell's first conviction for the capital murder of Stacey, which was reversed in Powell's first direct appeal. *Id.* Powell petitioned the court for rehearing on this issue and the court granted his motion. *See Powell IV*, 634 S.E.2d 289. On rehearing, the court found that there was an additional incorrect capital murder conviction entry in the NCIC report that referred to Powell's conviction for the attempted capital murder of Kristie. After acknowledging these errors, the court found that there was no valid claim for ineffective assistance of counsel under *Strickland* because Powell could not demonstrate prejudice. *Id.* at 299.

Powell contends that the state court's interpretation of the inaccuracies in the report is itself error because the court's determinations of what the state capital convictions actually meant was based on speculation. However, Powell's argu-ments fails. We must presume the correctness of a state court's factual determination unless the habeas petitioner

rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Powell has offered no clear and convincing evidence to rebut the presumption of correctness that we afford the state court's factual findings.

Next, Powell contends that the state court unreasonably applied *Strickland* because he has shown that his trial counsel was ineffective in failing to object to the NCIC report. We disagree. Under *Strickland*, Powell must show that "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. Stated differently, Powell can show prejudice and is entitled to relief only if he can show that had the NCIC report not been admitted, "there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins v. Smith*, 539 U.S. 510, 537 (2003). Absent this showing, Powell is not entitled to relief.

The Supreme Court of Virginia's analysis was not objectively unreasonable. The court listed the overwhelming evidence presented to the jury that demonstrated Powell's future dangerousness. This evidence included, *inter alia*: 1) the heinous details of the crimes; 2) the letter Powell wrote to the prosecutor following the first trial divulging of the circumstances of Stacey's attempted rape and death; 3) a taunting letter Powell wrote to Stacey's mother;[8] 4) another letter Powell wrote to the Commonwealth's Attorney stating that he wanted to get out of prison to "kill . . . everybody else in this f[**]ked up country that's not white;" 5) a letter Powell wrote asking a friend to threaten Kristie; and 6) Powell's admission

---

[8]While incarcerated, Powell sent a letter to Lorraine Reed, the mother of Stacey and Kristie. Powell enclosed a photograph of a woman who resembled Stacey and who was naked from the waist up. Among other things, Powell asked Lorraine for her help in indentifying who the woman in the picture resembled, directed Lorraine to ask Kristie for help if she could not determine who it resembled, and asked Lorraine to give his address to the person about whom he was referring.

to police that he wanted to "[k]ill a lot of somebodies . . . [j]ust for something to do." *See Powell IV*, 634 S.E.2d at 290-94. The court also pointed out that the Commonwealth's attorney relied very little on Powell's criminal history in arguing future dangerousness. *See Id.* at 297. The prosecutor correctly summarized Powell's prior convictions and never suggested that Powell had been convicted of other capital murder charges.

The state court balanced the aggravating evidence against the limited use of the NCIC report and noted that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 298 *citing Strickland*, 466 U.S. at 696. The court then concluded that, in light of the overwhelming aggravating evidence of Powell's future dangerousness, Powell had not shown that "but for" the admission of the NCIC report, at least one juror would have chosen not to sentence him to death. Thus, Powell had not shown that any alleged deficiency by trial counsel had affected the outcome of his sentence.

Powell's ineffective assistance of counsel claim fails. The state court properly applied *Strickland* to the facts of this case. First, it is reasonable to believe the jury understood Powell had not previously been convicted of the capital murder of two other victims in addition to Stacey. The jury knew Powell's previous conviction of the capital murder of Stacey had been successfully appealed and vacated based on the contents of Powell's letter to the Commonwealth's attorney. Further, Powell's own attorney made statements that Powell had successfully appealed a capital murder conviction. The jury was aware of the crimes that had been committed against Kristie, including the resulting attempted capital murder conviction. *See id.* Thus, it is reasonable that the jury, upon seeing the two entries for capital murder, would understand that the NCIC report's entries were inaccurate and actually referred to

the attempted capital murder of Kristie and the vacated conviction for the capital murder of Stacey.

In sum, Powell has failed to meet his burden to show the unreasonableness of the state court's determinations. We conclude that the state court's determination that Powell had not shown prejudice is not an unreasonable application of Supreme Court precedent or based on an unreasonable determination of the facts in light of the evidence presented at trial. Therefore, we affirm the dismissal of this claim.[9]

D.

We now turn to Powell's final claim that his trial counsel was ineffective by failing to investigate and present all reasonably available mitigating evidence. Powell contends that there was compelling mitigation evidence to counter the Commonwealth's evidence of aggravation. Powell maintains that counsel failed to counter the Commonwealth's arguments that, *inter alia*, he: held racist beliefs and tortured animals; was inherently violent; had no remorse; and was of above average intelligence. Generally, Powell contends that counsel was ineffective in failing to offer the following evidence: that

---

[9]Powell asserts three other reasons that the state court unreasonably applied federal law. First, Powell argues the state court failed to consider the totality of the evidence in performing its prejudice analysis. Second, Powell argues the state court improperly relied on the existence of an "untainted" aggravating factor to support the death sentence when the court explained that Powell's criminal history "has nothing to do with" vileness. We have reviewed the record in this regard and find no basis for relief.

Finally, Powell argues that the state court unreasonably applied *Strickland* by using an improperly elevated standard of prejudice. The state court described *Strickland's* standard as "highly demanding." *Powell IV*, 634 S.E.2d at 296 *quoting Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986). Powell's argument in this regard is not persuasive. In reviewing the state court's opinion, it is clear that it did not require a more demanding showing under *Strickland*; rather, the court was simply commenting that the standard was high and Powell had not met it.

Powell made racist statements for their shock value on listeners, rather than as expressions of true beliefs; that he was actually kind to animals; that he had never been inherently violent; that numerous persons witnessed him showing serious remorse for his crime; and that he is not of above average intelligence.

It is well-established that an individual claiming ineffective assistance of counsel must show, first, that counsel's performance was deficient, in that it "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Once counsel conducts a reasonable investigation of law and facts in a particular case, his strategic decisions are "virtually unchallengeable." *Id.* at 690. Tactical or reasonable professional judgments are not deficient but a failure to investigate a material matter due to inattention may be deficient. When the claim is that counsel failed to present a sufficient mitigating case during sentencing, the inquiry "is not whether counsel should have presented a mitigation case" but "whether the investigation supporting counsel's decision not to introduce mitigating evidence . . . was itself reasonable." *See Wiggins*, 539 U.S. at 523 (internal citations omitted).

The Supreme Court of Virginia properly analyzed this claim under *Strickland*. Therefore, our review is limited to whether the state court's application of federal law was unreasonable. The Supreme Court of Virginia examined each claim and properly made a determination under *Strickland* of whether Powell had shown deficiency of counsel's performance and prejudice. We have examined each of Powell's contentions and find that the state court's determinations were not an unreasonable application of *Strickland*. Therefore, we affirm the dismissal of this claim.

III.

Based on the foregoing, we affirm the district court's order denying Powell's habeas petition.

*AFFIRMED*

GREGORY, Circuit Judge, concurring in part and dissenting in part:

I concur with the reasoning of the majority's opinion on Powell's ineffective assistance of counsel claims. However, I find nothing reasonable about the Supreme Court of Virginia's finding in *Powell II* that the bill of particulars nullified the Commonwealth's conduct at Powell's first trial. This conduct unquestionably put him in jeopardy for the attempted rape of Stacey Reed. Even taking into account the nearly insurmountable burden placed on Powell by virtue of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), I am left with the firm conclusion that the Supreme Court of Virginia's post-hoc rationalization in *Powell II* is an unreasonable determination of the facts in light of the evidence presented, and thus Powell's conviction for capital murder must be reversed.

The Fifth Amendment to the United States Constitution provides that no "person be subject for the same offense to be twice put in jeopardy of life or limb." There can be no doubt that Powell was actually put in jeopardy for the gradation offense of the attempted rape of Stacey during the first trial, and thus his second capital murder trial violated the Double Jeopardy Clause. Although the bill of particulars purportedly identified Kristie Reed as the victim of the gradation offense, the Commonwealth nevertheless argued throughout the first trial that Powell attempted to rape Stacey prior to her murder. In the Commonwealth's opening argument, counsel stated:

> Stacie [sic], the older girl, knew the Defendant, had met him sometime before. They had a friendship, a social acquaintance. You'll hear evidence that *he wanted more from her than that*. You'll hear evidence that she was cool towards him.
>
> . . . .

. . . And on the afternoon of the 29th, there was nobody home with Stacie [sic] when he came over and they argued about this boy that she was dating. *And he wanted something from her and she wasn't going to give it to him and for that she lost her life.*

(J.A. 24-25 (emphasis added).) During the trial, the Commonwealth put on circumstantial evidence suggesting that Powell had attempted to rape Stacey, and even argued as much to the trial court. In response to Powell's motion to strike the indictment for insufficiency of the evidence, counsel argued that

[W]e have evidence here, again, from Mr. Neff that according to him *[Powell] was having sex or attempting to have sex with Stacie [sic] when the phone rang*. When she got up and answered the phone, then she wanted nothing to do with him, and at that point in time he got mad and said —the testimony was, he said, "It was that nigger, wasn't it?" He pulled out his knife and stabbed her.

*Again, evidence, in that regard of his intent to rape and have sex and wanting sex.*

(J.A. 43 (emphasis added).) Furthermore, the Commonwealth elicited testimony from Officer Daigneau, who testified that a physical evidence recovery kit had been obtained from Stacey and such kits are "routinely done in cases of sexual assault." (J.A. 29; *see also* J.A. 29-31.)

Tellingly, at no time during the trial did the Commonwealth ever specifically identify Kristie as the victim of the gradation offense.[1] Nor did the trial court make any attempt to clarify

---

[1]While the majority points out that the evidence presented by the Commonwealth during the first trial was "not a basis for a charge of attempted rape" (Maj. Op. 17), that analysis conflates the issue of whether an individual was put in jeopardy for an offense with the issue of whether the prosecution put on sufficient evidence to convict an individual for that offense. The Commonwealth did not fail to prosecute Powell for the attempted rape of Stacey, it just failed to do so successfully, and the majority misses that point in its analysis.

that the bill of particulars identified Kristie as the victim of the gradation offense. In its instructions to the jury, the trial court stated that

> [t]he Commonwealth must prove beyond a reasonable doubt each of the following elements of that crime:
>
> 1. That the defendant killed Stacie [sic] Reed; and
>
> 2. That the killing was willful, deliberate and premeditated; and
>
> 3. That the killing occurred during the commission of robbery and/or attempted robbery and/or during the commission of, or subsequent to *rape*.

(J.A. 59 (emphasis added).) With regard to first-degree murder, the trial court gave similarly broad instructions:

> If you find from the evidence that the Commonwealth has failed to prove that the killing was deliberate and premeditated, but the killing was willfully committed during the commission of robbery or attempted robbery *and/or rape or attempted rape,* you shall find the defendant guilty of first degree murder.

(J.A. 60 (emphasis added).) Given the lack of specificity in the jury instructions, it is not surprising that during deliberations the jury asked: "Can a guilty verdict for the rape of Kristie be used to satisfy jury instruction number 4, element 3?"[2]

---

[2]In fact, the trial judge initially indicated that the answer to this question was "no." (J.A. 53.) Such an answer would only make sense if the judge thought that the attempted rape of Stacey would satisfy the requirement of the gradation offense and that the jury could convict Powell of that offense.

(J.A. 62.) The fact that the jury needed to ask this question demonstrates that the jury was unaware that the bill of particulars identified Kristie as the sole victim of the gradation offense, and it further implies that the jury was considering the rape or attempted rape of both Stacey and Kristie in reaching its verdict.

On appeal, the Supreme Court of Virginia itself recognized that Powell had been put in jeopardy for the rape or attempted rape of Stacey, and indeed based its decision in part on that finding. *See Powell I*, 552 S.E.2d at 363. After reversing Powell's capital murder conviction because the indictment had been improperly amended, the court continued:

> [W]e now further determine that there is no basis upon which Powell can be retried for capital murder on remand. The poll of the jury establishes that Powell was acquitted of the charge of capital murder in the commission of robbery or attempted robbery. *It is equally clear that there is simply no evidence upon which the jury could have relied to find that Powell committed or attempted to commit any sexual assault against Stacey before or during her murder*, or that the rape of Kristie did not occur after the murder of her sister. . . .
>
> For these reasons, we will reverse Powell's conviction for capital murder, affirm his convictions for abduction, rape, attempted capital murder, and grand larceny, and remand the case for a new trial on a charge of *no greater than first degree murder for the killing of Stacey Reed*, if the Commonwealth be so advised.

*Id.* (emphasis added). It is perplexing that the Supreme Court of Virginia would have made such a finding if, in fact, the rape or attempted rape of Stacey had not been litigated in the first trial.

In affirming Powell's capital murder conviction in *Powell II*, however, the Supreme Court of Virginia reversed course. The court characterized its earlier references to the sexual assault of Stacey as merely "'the circumstances of this case'" as they existed at the time of the first trial, 590 S.E.2d at 552 (quoting *Powell I*, 552 S.E.2d at 363). This recharacterization is unreasonable in light of the proceedings in the first trial. At every turn, the Commonwealth, the trial court, the jury, and even the Supreme Court of Virginia acted as though Powell were on trial for the murder of Stacey in the commission of any rape or attempted rape, and not specifically on trial for the murder of Stacey in the commission of the rape of Kristie.

Like the Supreme Court of Virginia, the majority claims that "no one involved litigated as though Powell was being tried for murder during the rape or attempted rape of Stacey." (Maj. Op. 17 n.6.) Yet, the majority provides no explanation for why the Commonwealth elicited testimony that police officers performed a physical evidence recovery kit on Stacey or made intimations that Powell attempted to sexually assault Stacey. (*See* J.A. 29, 24-25.) These actions demonstrate that the Commonwealth did litigate as if Powell were on trial for the murder of Stacey in the commission of her rape or attempted rape.

In further support of its finding that Powell had not already been put in jeopardy for the rape or attempted rape of Stacey, the Supreme Court of Virginia found that the bill of particulars served to narrow the offense of jeopardy to include only the rape of Kristie:

> [W]here, prior to the attachment of jeopardy, the Commonwealth limits the prosecution of a capital murder, undifferentiated in the indictment by the identity of the victim of the gradation offense, by naming a specific victim of the gradation offense in a bill of particulars, jeopardy will attach only to the

capital murder charge as made specific by the bill of particulars.

*Powell II*, 590 S.E.2d at 554. The majority now relies on this holding in finding that the Supreme Court of Virginia committed no reversible error in its application of federal law. (*See* Maj. Op. 15-17.)

Even assuming that this holding is not unreasonable as a matter of law, it overlooks the fact that the Commonwealth did *not* actually limit its prosecution for capital murder to the rape of Kristie. Moreover, neither the prosecution nor the trial court ever specified to the jury that the bill of particulars identified Kristie as the victim of the gradation offense. Had the trial court excluded evidence suggesting that Powell had attempted to rape Stacey or clarified that the attempted rape of Stacey could not satisfy the requirements of the gradation offense, the Commonwealth would have a stronger argument that the bill of particulars had a limiting effect—but that is not the case here. Instead, the bill of particulars operated as a double-edged sword for Powell: on one hand, the Commonwealth ignored its import in putting on circumstantial evidence suggesting that Powell had sexually assaulted Stacey before her murder, while on the other hand the Commonwealth was able to use the bill of particulars as a safety valve to later retry Powell for capital murder when new evidence came to light.

Notwithstanding the above analysis, the majority concludes that the rape or attempted rape of Stacey was somehow not litigated because Powell's trial counsel "clearly recognized" the limiting effect of the bill of particulars, "as evidenced by their comments to the court and to the jury." (Maj. Op. 17 n.6.) Again, the majority misses the point. I agree that Powell's trial counsel understood that the bill of particulars should limit the prosecution of the gradation offense. Indeed, Powell's trial counsel submitted proposed jury instructions specifying that Kristie was the victim of the gradation offense. (R.

vol. 21 at 1213.) The problem is that despite counsel's exhortations, the trial court did not use the proposed jury instructions or otherwise clarify this point to the jury.

Finally, the majority contends that the trial judge impliedly recognized the effect of the bill of particulars when he instructed the jury that "[s]exual intercourse means an actual penetration, no matter how slight, of the Defendant's penis into the sexual organ of Kristi[e] Reed." (R. vol. 20 at 1024-25.) But the majority takes this instruction out of context. Along with capital murder, Powell was charged with the rape of Kristie. It was in instructing the jury on this latter charge that the trial judge used the phrase "sexual intercourse."[3] (R. vol. 20 at 1020.) Thus, when the trial judge clarified the definition of sexual intercourse, it was for the purposes of the rape charge, which specified Kristie as the victim, and not the capital murder charge, *which did not specify Kristie as the victim*.

Undoubtedly, the crimes committed by Paul Powell were atrocious. Given the explicit details revealed by Powell in his letter to the Commonwealth's attorney, one understands the strong inclination to prosecute Powell for those heinous acts. Yet, it is in these very cases that we must be most vigilant in protecting our long-standing constitutional guarantees. The Double Jeopardy Clause makes no distinction between the innocent and the guilty, nor any exception based on the severity of the offense or the personal attributes of the accused. In

---

[3]The trial judge gave the following instructions on the rape charge: "The Commonwealth must prove beyond a reasonable doubt each of the following elements of th[e] crime [of rape]: One, that the Defendant had sexual intercourse with Kristi[e] Reed; and two, that it was against her will and without her consent; and three, that it was by force, threat, or intimidation." (R. vol. 20 at 1020.) By contrast, the trial judge gave the following instructions on the capital murder charge: "The Commonwealth must prove beyond a reasonable doubt each of the following elements of th[e] crime [of capital murder]: . . . 3. That the killing occurred during the commission of robbery and/or attempted robbery and/or during the commission of, or subsequent to rape." (J.A. 59.)

finding that the attempted rape of Stacey had not been litigated in the first trial, the Supreme Court of Virginia made an unreasonable determination of the facts in light of the conduct of all parties involved in that trial. This determination had the unconstitutional effect of permitting the Commonwealth to try Powell a second time in violation of his Fifth Amendment rights. Given this outcome, Powell's second capital murder conviction should not stand, and I must dissent.