**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 09-7216

JAMES MICHAEL FLIPPO,

Petitioner – Appellant,

v.

THOMAS L. MCBRIDE, Warden,

Respondent - Appellee.

Appeal from the United States District Court for the Southern
District of West Virginia, at Beckley.   Thomas E. Johnston,
District Judge.  (5:05-cv-00765)

Argued:  March 26, 2010                 Decided:  August 30, 2010

Before MICHAEL and DAVIS, Circuit Judges, and Eugene E. SILER,
Jr., Senior Circuit Judge of the United States Court of Appeals
for the Sixth Circuit, sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Ira Mickenberg, Saratoga Springs, New York, for
Appellant.   Silas B. Taylor, OFFICE OF THE ATTORNEY GENERAL OF
WEST VIRGINIA, Charleston, West Virginia, for Appellee.   **ON
BRIEF:** Darrell V. McGraw, Jr., Attorney General, Charleston,
West Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

On October 23, 1997, a West Virginia jury convicted petitioner James Michael Flippo of murdering his wife. Following a sentencing hearing, the trial judge sentenced him to life without parole. Flippo sought relief on direct appeal, but the Supreme Court of Appeals of West Virginia ultimately affirmed his conviction and sentence. Having exhausted his direct appeals, Flippo timely filed for habeas relief, first in state court and then in federal court. As grounds for relief, he argued (1) that the introduction of certain expert testimony violated his right to due process because it was "objectively false" and (2) that he was denied effective assistance of counsel when his trial lawyer opened the door to questions about his sexuality. The federal magistrate judge assigned to the case recommended that the writ be denied, and the district court adopted this recommendation. Flippo appeals. We affirm.

I.

At sometime between the hours of two and three in the morning on April 30, 1996, Flippo called 911 for emergency assistance. He told the operator that he and his wife had been staying in a cabin in Babcock State Park when they were attacked by an unknown intruder. The operator notified the police, who arrived on the scene at approximately 2:40 a.m. The police

2

found Flippo distraught and suffering from minor injuries, later identified as bruises on the front and back of his head, and cuts and scratches on his legs. He took them back to the cabin, where they found his wife, Cheryl Flippo, lying on the floor with "very visible and obvious injuries to her head." J.A. 724. Indeed, the head injuries were so severe that brain matter was exposed. Paramedics confirmed that she was dead. Dr. Zia Sabet, assistant medical examiner in the West Virginia Medical Examiner's Office, later concluded that Cheryl Flippo had died from blunt force injuries to the head, and that the death was a homicide.

In Flippo's statement to the police, he claimed that he had awoken in the middle of the night to see a masked man lying between his bed and the wall. He attempted to warn his wife but was struck with a fire log, rendering him unconscious. According to Flippo, when he regained consciousness, he found the masked man cutting his thighs with a knife and threatening to cut off his penis. Before Flippo could react, the masked man again knocked him out with the log. When Flippo came to a second time, the intruder was gone and his wife was unconscious. Unable to wake his wife, Flippo ran to a pay phone outside the park and called 911.

Shortly after Flippo gave his statement, the police began to give "some consideration to Flippo as a possible crime

3

suspect in the case because of developing, inconsistent and conflicting evidence." J.A. 728. Evidence from the crime scene showed no signs of forced entry and no footprints attributable to an intruder. While Flippo never mentioned the intruder using any kind of restraint, inside the cabin the police found a roll of duct tape with Flippo's fingerprint on it and a small piece of duct tape from that roll near his wife's body. The police also determined that the pattern of blood stains indicated that "blood had been deliberately transferred to, or placed on, the mattress and pillow," and that a rocking chair had been deliberately placed in an overturned position after the murder. J.A. 731. Finally, Flippo's insistence that he and his wife had been stalked prior to the evening in question was substantiated by "[n]o credible or reliable evidence." J.A. 742.

In an effort to assess the veracity of Flippo's statements regarding his own injuries, the police had Flippo examined by Dr. Irvin Sopher, a retired chief medical examiner. Sopher concluded that Flippo's injuries were inconsistent with his story and eventually gave testimony concerning this conclusion at Flippo's trial. With regard to the cuts on Flippo's leg, Sopher opined at trial that the pattern "we're seeing on these thighs is exactly what one would see with self-inflicted injuries" with a nail or screwdriver rather than a

4

large knife. J.A. 570. With regard to Flippo's bruises, Sopher testified that "[i]n my opinion, there was no significant injury to his head, and certainly no significant injury, even in consideration of that 48-hour time frame, that would have resulted in an unconscious state at the time that these events occurred." J.A. 574. Responding to a question about what he would expect to find after a person had been hit with "a log or a heavy or blunt object, sufficient enough to render them unconscious," J.A. 561, Sopher testified:

> Well, you'd find a considerable bruise. I mean, there's no question about that. And you would find on the skin surface some abrasion or scraping and you would find, in all likelihood, from a blow from a blunt object . . . a split of the skin. . . . And the reason for that is that when one receives a severe blow to the head from a blunt object, there is, unlike in your extremities, such as your arm or your leg, there is no buffer. There is no soft tissue of any substantial thickness underlying your forehead or your scalp to sustain the energy involved in the impact.

J.A. 562.

The police also uncovered numerous pieces of evidence suggesting that Flippo's marriage was strained and that he had motive to kill his wife. Flippo was a pastor at the Landmark Church of God in Nitro, Kanawha County, and the police interviewed several of his congregants. Tamara Lynn Cremeans, a congregant and friend of the Flippos, testified at trial that James Flippo had asked her to pray for Cheryl Flippo only six days before the murder because of Cheryl's "dislike of his

5

friendship with Joel Boggess." J.A. 733. Boggess was another member of Flippo's congregation as well as a business partner in the purchase of some real estate. One of Flippo's fellow pastors, the Reverend Timothy Allen Cremeans, testified at trial that Flippo had expressed frustration over Cheryl's opposition to his business venture with Boggess. When the Reverend Cremeans asked Flippo if Cheryl was ultimately going to go along with it, Flippo answered "yes" because "I'm sick of her right now. She knows if she doesn't go along with it, I'll leave her." J.A. 366, 733.

There was also evidence that Flippo would benefit financially from his wife's death. The couple had previously been involved in a car accident and received a settlement of $80,000. The Flippos had put the money in a retirement account, however, requiring the permission of both parties for any withdrawal. Also, shortly before the murder, an insurance policy on Cheryl Flippo's life had been issued in the amount of $100,000. Accordingly, Cheryl's death gave her husband access to almost $180,000.

Finally, there was some, admittedly scant evidence that Flippo and Boggess were involved in a homosexual relationship. In a briefcase at the crime scene the police discovered several photographs "depicting a man, later identified as Joel Boggess, in what appeared to be wet clothes,

6

and the man was either putting on or taking off his jeans." J.A. 732. These photos, together with Flippo's friendship with Boggess and his wife's dislike of the friendship, prompted Flippo's trial counsel to raise the issue on cross-examination. Boggess denied being a homosexual and testified that "to the best of his knowledge, Flippo was not a homosexual." J.A. 736. The trial judge had, by pre-trial order, forbidden the prosecution from raising the issue, and consequently it had not been raised prior to the defense's questions.

On this evidence, a West Virginia jury convicted Flippo of first degree murder, and the trial judge sentenced him to life without parole the following day. After several years of appeals, Flippo's conviction became final on November 27, 2002. Flippo subsequently filed a timely state habeas petition that was denied without an evidentiary hearing. In a detailed, well-reasoned opinion, the state habeas judge — who also tried the case — rejected both Flippo's argument that Dr. Sopher's testimony amounted to "junk science and lies" and his argument that his counsel provided ineffective assistance when he raised the homosexuality issue. J.A. 745-48. The judge dismissed the argument concerning Dr. Sopher's testimony as "wholly without merit" in light of Sopher's clear competence to determine both the extent of the injuries and their possible causes. With regard to Flippo's ineffective assistance claim, the judge

7

determined that Flippo's counsel made a reasonable, tactical decision when he raised the issue of homosexuality and that, in any event, there was no likelihood that the result would have been different if he had not raised the issue.

Flippo timely filed this application for a federal writ on September 15, 2005. The district court accepted the magistrate's recommendation to deny the writ and overruled Flippo's objections. Although the factual basis of Flippo's federal petition was identical to that of his state petition, there was some dispute over the legal theory supporting his "junk science" argument. The magistrate judge had assumed that Flippo was arguing that Dr. Sopher's testimony violated due process solely because the prosecution knew the testimony was false. In his objections, however, Flippo argued that his due process objection was alternatively based on "fundamental fairness" under a different line of case law. J.A. 894-95. The district court held that this legal theory had not been presented to the state courts and therefore was unexhausted and procedurally barred. It rejected Flippo's other arguments for largely the same reasons as the state courts. This appeal followed.

## II.

Flippo has consistently argued at every relevant stage of the proceedings that the introduction of Dr. Sopher's

8

testimony violated his constitutional right to due process and that his trial lawyer's raising of the homosexuality issue violated his right to effective assistance of counsel. The first argument has been made — not always as consistently — on alternative grounds: (1) the objective falsity of Sopher's testimony itself violated due process; and (2) the fact that the prosecution knew or should have known it was false violated due process. The state argues that the district court correctly held that the first ground for Flippo's due process claim is unexhausted and procedurally barred. On Flippo's other claims, the state argues simply that they are without merit.

A.

Where the state courts have adjudicated a claim on the merits, federal courts may not grant a writ of habeas corpus unless the state court decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). This court "reviews de novo the district court's application of the standards of 28 U.S.C. § 2254(d) to the findings and conclusions of the [state] court." McNeill v. Polk, 476 F.3d 206, 210 (4th Cir. 2007).

Although courts may reach the merits of a habeas petition to deny it, 28 U.S.C. § 2254(b)(2), they cannot issue

9

the writ for unexhausted or procedurally defaulted claims. An exhausted claim has been "fairly presented" to the state courts. Matthews v. Evatt, 105 F.3d 907, 911 (4th Cir. 1997). A procedurally defaulted claim is one that either has been, or would be, rejected by the state courts, not on the merits, but on the basis of an adequate and independent state procedural rule. Burket v. Angelone, 208 F.3d 172, 183 (4th Cir. 2000). Courts may excuse a procedural default and reach the merits of a claim only if petitioner can show "cause for the default and prejudice resulting therefrom or that a failure to consider the claims will result in a fundamental miscarriage of justice." Polk, 476 F.3d at 211.

### B.

We need not decide whether any aspect of Flippo's due process claim is unexhausted because the claim fails on the merits. Flippo has consistently cited three cases to support both legal theories: Miller v. Pate, 386 U.S. 1 (1967), Napue v. Illinois, 360 U.S. 264 (1959), and Giglio v. United States, 405 U.S. 150 (1972). Under either of Flippo's theories, his claim cannot succeed unless he demonstrates that Sopher's testimony was false. See Miller, 386 U.S. at 7 ("More than 30 years ago this Court held that the Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence. . . . There can be no retreat from that

10

principle here."); Napue, 360 U.S. at 269 ("[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment."); Giglio, 405 U.S. at 153-54 (holding that due process was violated where a cooperating witness testified falsely on cross-examination that he had never received a promise of non-prosecution and the state did not correct the falsehood). We reject Flippo's claim because the state court's determination that Dr. Sopher's testimony was not false was not unreasonable.

After finding Dr. Sopher competent to offer the opinion that he did, the state habeas judge turned to Flippo's claim that Sopher's testimony was false:

> The Petitioner's characterization of Dr. Sopher's testimony as "false" and "fabricated" and that the State aided in the presentation of such evidence which the State knew to be false is wholly and utterly without any merit. For Dr. Sopher's trial testimony to be deemed false or a lie it would have to be conclusively shown that his trial testimony was totally and wholly different from what he truthfully and actually believed at the time he so testified. Such was not the case here.

J.A. 746. Flippo argues that the district and state courts erred because they misconstrued what it means for testimony to be "false." Appellant's Br. at 27-28. Whether a witness believes what he says is relevant to whether that witness is lying, but not to whether what he says is the truth. A person

11

could produce expert evidence that the earth is flat, believe that the earth is flat, and still be wrong.  With regard to Sopher's testimony, Flippo has proffered the statement of a neuropsychologist, as well as several treatises and articles, to support his claim that no expert could determine if an injury caused unconsciousness through a mere surface examination.  Accordingly, Flippo argues, Sopher's testimony that he could not have been knocked unconscious must be false because it too was based on a mere surface examination.

Flippo's argument does not fail because it lacks analytic coherency, but rather because it lacks support in the case law.  In Napue and Giglio the false testimony at issue was whether the prosecution had made promises to a witness in return for his testimony — a fact directly observable to a lay person and requiring no expert testimony.  Napue, 360 U.S. at 265; Giglio, 405 U.S. at 150-51.  While Miller did involve expert testimony, the falsity of the expert testimony given at trial was not challenged by the state.  Miller, 386 U.S. at 5.  In Miller the prosecution's case hinged on a pair of shorts, allegedly owned by the defendant and stained with the victim's blood.  Id. at 4.  Believing that the shorts were in fact stained with paint, the prosecution nevertheless put on an expert witness to corroborate the theory that the stains were the victim's blood.  Id. at 4, 6.  When the defendant produced

12

his own expert witness in habeas proceedings to testify that the stains were paint, the state did not object. Id. at 5. Miller did not therefore involve a battle of the experts, but rather testimony recognized as false by both parties. Indeed, it is far from clear that the result in Miller would have been the same if the state had contested the petitioner's expert findings.

These cases do not provide support for finding a due process violation whenever a petitioner comes forward, post-trial, with additional expert evidence challenging a trial expert's testimony. Flippo should have presented his expert evidence to a jury, not a habeas court. But even if Miller could be stretched to cover this case, it was not unreasonable for the state habeas court to find that Sopher's testimony was not "false" within the boundaries set by the Supreme Court for that term. See Winston v. Kelly, 592 F.3d 535, 554 (4th Cir. 2010) ("For a state court's factual determination to be unreasonable under § 2254(d)(2), it must be more than merely incorrect or erroneous. It must be sufficiently against the weight of the evidence that it is objectively unreasonable.") (internal citations omitted). Flippo's own expert evidence largely concerned the general question of determining whether a person was unconscious for a period time, rather than whether the cause of Flippo's specific injuries could have induced an

13

unconscious state. Consequently, we conclude that Flippo has failed to carry his burden to show that Sopher's testimony was false, let alone that the state court's contrary finding was sufficiently against the evidence to be objectively unreasonable.

C.

The primary issue raised by Flippo's ineffective assistance claim is whether his trial counsel's decision to cross-examine Boggess on his alleged homosexuality was strategic. Strategic decisions are insulated from challenge for ineffective assistance. Powell v. Kelly, 562 F.3d 656, 670 (4th Cir. 2009) ("Once counsel conducts a reasonable investigation of law and facts in a particular case, his strategic decisions are virtually unchallengeable.") (internal quotation marks omitted). Accordingly, if the state courts reasonably determined that Flippo's counsel's decision was strategic, his claim must fail. Flippo argues that the decision was not strategic, and that, in the alternative, the issue presents a factual question that must be resolved at a hearing. Appellant's Br. at 33-34. The state responds that there is no factual allegation which "if proven, would demonstrate that Petitioner is entitled to relief under the stringent standards of § 2254(d)."

Flippo's argument fails because he has failed to carry his burden. It is his burden to prove, by "clear and convincing

14

evidence," any facts material to his claim that contradict factual findings of the state courts. 28 U.S.C. § 2254(e)(1). The state habeas court concluded that trial counsel's decision was strategic, and Flippo has not even alleged the existence of contrary facts. No allegations have been made, for example, concerning what Flippo's trial counsel believed with regard to his decision. With regard to whether the district court should have granted Flippo's request for a hearing, that decision rests within the discretion of the district court, Schriro v. Landrigan, 550 U.S. 465, 468 (2007), and there is no reason to believe that the district court abused that discretion here.

## III.

For the reasons stated above, the district court's denial of petitioner's application for a writ of habeas corpus is affirmed.

AFFIRMED

15